R. A. CHISHOLM, Plaintiff-Appellee,

v.

WESTERN RESERVES OIL COMPANY,
Defendant-Appellant.

No. 79–1438.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 2, 1981.

Decided July 21, 1981.

Foster D. Arnett, F. Michael Fitzpatrick, Arnett, Draper & Hagood, Knoxville, Tenn., for defendant-appellant.

R. Allen Wilson, Owensboro, Ky., George H. Buxton, III, Oak Ridge, Tenn., for plaintiff-appellee.

Before LIVELY and MARTIN, Circuit Judges, and BERTELSMAN, District Judge.*

BERTELSMAN, District Judge.

This is a diversity case, the result of which is controlled by the law of Tennessee. It involves a claim by the plaintiff, R. A. Chisholm, appellee here, against the defendant, Western Reserves Oil Company, for a two percent overriding royalty interest (O.R.I.) in a certain oil lease. The case was tried by consent of the parties before the Honorable Robert P. Murrian, United States Magistrate as a Special Master. The magistrate recommended judgment for the plaintiff for the full relief claimed. His recommendation was accepted by the district court.

This court accepts the findings of fact of the magistrate, as being supported by substantial evidence and not clearly erroneous.[1] In summary, the magistrate found that the plaintiff, an oil and gas lease broker representing the defendant, was entitled to a two percent O.R.I. in an oil lease known as the Bland-Bertram lease. The plaintiff was engaged by the defendant to seek out and acquire oil leases for the defendant. The plaintiff was to receive a two percent O.R.I. in leases he acquired for the defendant.

The Bland-Bertram tract was a lease acquired by the defendant without the assistance of the plaintiff. However, the defendant's lease was to expire in late October 1975, unless certain drilling or production activities were in progress. When the plaintiff told the defendant that he would like to try to find someone to drill on this lease, he was told to "see what you can do." The plaintiff, acting on behalf of the defendant, contacted a driller who could begin drilling before the lease expired, and agreed to do so in return for an interest in the leasehold, and thus was instrumental in saving the lease. The driller struck oil, and the well is still producing.

The magistrate also found that the intent of the parties was that plaintiff would be compensated for his efforts, that the measure of compensation was to be an O.R.I. of two percent, and that the intent of the defendant to pay that amount was indicated by its conversations with certain third parties to the effect that two percent of the royalty had to be set aside to protect its landman. This finding was not clearly erroneous, and indeed supported by more than substantial evidence.

The defenses of Western Reserves to the claim of the plaintiff below and here are: (1) that the plaintiff could not claim what arguably was a commission, because he was not a licensed real estate broker; (2) that there was no specific oral or written agreement between the parties; (3) that plaintiff's recovery was barred by the statute of frauds; and (4) that it was erroneous to employ the device of a constructive trust in this situation.

In the opinion of this court the contentions of the defendant-appellant are without merit and the decision below must be affirmed.

█ The Tennessee Real Estate Broker's statute [2] forbids the recovery of a commis-

---

* Hon. William O. Bertelsman, Judge, United States District Court for the Eastern District of Kentucky, sitting by designation.

1. See Appendix for the text of the magistrate's findings of fact.

2. Tenn.Code Annot. §§ 62–1301—1342 (§ 62–1308, in particular).

sion by one acting as a real estate broker without a license. Concerning these issues the magistrate found that by reason of the long course of dealing between the parties, in which plaintiff never represented himself to be a real estate broker or have a broker's license and the lack of a broker's license was never raised by the defendant, defendant was estopped to invoke the statute in the circumstances involved in the present case. This court accepts that finding. The views of the Tennessee magistrate and trial judge regarding the interplay of policies underlying the broker's statute and the equitable doctrine of estoppel, as they exist in Tennessee, are entitled to respect by this court.[3]

The remaining defenses are so intertwined that they are best discussed together.

■ The relationship of the plaintiff and defendant was that of principal and agent, which equity considers to be a confidential relationship.[4] When the defendant told the plaintiff to "see what he could do" concerning the Bland-Bertram tract, the relationship between the parties was such that an implied contract arose. The gist of the implied contract was that if the plaintiff was successful in accomplishing a desirable result for the defendant with regard to the matter in question, he was to be paid a reasonable fee for his services.[5] The compensation under the implied contract was not necessarily to be measured by an hourly rate, but rather by the reasonable value of the services, which were to be judged by the customs and practices prevailing in that kind of business.[6]

■ The defendant argues that the overriding royalty interest claimed by the plaintiff in the lease is an interest in real estate, and that, therefore, plaintiff's contract claim on oral or implied contract is barred by the Tennessee statute of frauds. If a constructive trust arises, however, the statute of frauds is inapplicable.[7]

■ This court agrees with the magistrate and the trial judge that a constructive trust is appropriate in this situation.

"On the whole, however, the constructive trust is seen by American courts today as a remedial device, to be used wherever specific restitution in equity is appropriate on the facts. Thus restitution by way of constructive trust may be appropriate for embezzlement of money or for conversion of goods, for benefits transferred under mistake, or because of fraud, or duress, or undue influence, and for gains received by reason of misuse of position or information. Analogous relief has been given for such torts as infringement of copyright and the like. Even the murderer for gain may be a constructive trustee.

\* \* \* \* \* \*

It is entirely appropriate to award a constructive trust as a means of forcing restitution to prevent unjust enrichment. For this purpose, it does not much matter how the unjust enrichment came about. What must give concern is not the method by which the defendant enriched himself, but the fairness and workability of the judicial decree."[8]

■ It is well established that a constructive trust is an appropriate remedy to re-

3. *Randolph v. New England Mutual Life Ins.*, 526 F.2d 1383 (6th Cir. 1975); *In re Winters*, 586 F.2d 1363 (10th Cir. 1978); *Lamb v. Amalgamated Labor Life Ins. Co.*, 602 F.2d 155 (8th Cir. 1979).

4. *Black v. Pettigrew*, 38 Tenn.App. 1, 270 S.W.2d 196 (1953); *Appleby v. Buck*, 351 S.W.2d 494 (Ky.1961).

5. *Murray v. Grissim*, 40 Tenn.App. 246, 290 S.W.2d 888 (1956); *Slesinger v. Glatt*, 52 Tenn. App. 307, 373 S.W.2d 220 (1962). At one point the magistrate stated that there was no oral or written contract between the parties. Clearly, he did not intend this statement to be so broad as to be applicable to implied contracts.

6. *Slesinger v. Glatt, supra. Fulton v. Tennessee Walking Horse Breeders Association of America*, 476 S.W.2d 644 (Tenn.App.1971).

7. *Appleby v. Buck, supra* note 4, and authorities cited therein.

8. Dobbs, *Remedies* 246 (1973).

dress breach of a fiduciary or confidential relationship.[9]

"As is hereinafter shown the duty of loyalty extends to many fiduciaries other than trustees, such as executors, guardians, corporate directors, *agents*, partners and joint adventurers, and attorneys; *the remedy of the constructive trust may be used against them where they have obtained a personal benefit by breach of the duty.*

"In addition, the duty and the remedy exist with respect to persons who are in a 'confidential relation', a term having no exact definition but involving dominance and superiority because of such elements as close family relationship, *a long continued practice of entrusting business matters to a confidant,* and differences in age, health, and education. For example, if an aged and infirm father lives with a son who advises and assists his father in business matters, it may well be held that they are in a confidential relation.

"Examples of the use of a constructive trust as a remedy for breach of the duty of loyalty may be found in cases where a trustee as an individual purchases the trust property or a claim against it (for example, a mortgage), or where the trustee sells his individual property to the trust as an investment, or where a trustee employs himself to render services needed by the trust (for example, legal advice or property appraisement), or where a trustee holds a lease which is about to expire and secures a renewal for himself instead of for the trust, or where an agent to purchase property for his principal with the money of the principal buys for himself and pays for the property out of his own funds, *or where a partner or joint adventurer in oil properties buys for himself property which*

should have been acquired for the joint enterprise." [10]

In light of the above authorities, the magistrate and trial judge below were fully justified in imposing a constructive trust in the circumstances revealed by the evidence in this case. These circumstances were that a custom of confidential dealings as principal and agent had existed between the defendant oil company and plaintiff, its landman, for a period of years; that an implied contract had been made between them whereby the landman was to receive a two percent O.R.I. if he was able to "do anything" for the benefit of his principal with regard to the lease in issue; and that the defendant breached the confidential relationship when it refused to honor the contract.

Therefore, the judgment below is affirmed.

## APPENDIX

### MAGISTRATE'S FINDINGS OF FACT

"The plaintiff is a citizen and resident of Pennsylvania and the defendant is a limited partnership formed in Texas and engaged in the business of discovery and production of oil and gas for commercial use in several states, including Tennessee. At the plaintiff's suggestion and initiative,[1] the defendant became interested in the possibility of acquiring oil and gas leases in Scott and Morgan counties in Eastern Tennessee.

"The plaintiff was hired by the defendant for this purpose in late 1970 or early 1971 and was to be compensated by a $25 per diem and an assignment of a 2% overriding royalty interest (ORI)[2] in the gross revenues received by virtue of the production of oil and gas on the leases that the plaintiff acquired for the defendant.[3] *See* Exhibits 2, 3 and 12. The sole dispute herein is

**9.** *Id.* at 684; Bogert, *Trusts* § 86 (5th ed. 1973); *Sanders v. Forcum-Lannom, Inc.*, 475 S.W.2d 172 (Tenn.1972).

**10.** Bogert, *Trusts, supra* note 9, at 315–16 (emphasis added).

**1.** "*See* Exhibit 2." [magistrate's footnote]

**2.** "Generally speaking, an ORI in a gas or oil well is an interest taken 'off the top' of the gross production of the well except for certain tax payments, *i. e.*, it is diminished by operating costs." [magistrate's footnote]

**3.** "The per diem payments were to cover the plaintiff's expenses for his time, automobile, meals and lodging while working for the de-

whether or not the plaintiff is entitled to a 2% ORI on the lease that the parties referred to as the Bland-Bertram lease.[4]

"Western Reserves Oil Company (Western Reserves or defendant) acquired the Bland-Bertram lease as a part of the leasing of a larger tract in 1972 or 1973. The defendant's lease was to expire, according to its terms, in late October, 1975 unless certain drilling or production activities were in progress on or before the date of expiration. If such activities were in progress, the lease was extended by its terms and if a producing well or wells were discovered, the lease would continue in effect until such production ceases.

"According to the testimony of both the plaintiff and Richard Beveridge, Western Reserves' managing partner, Mr. Chisholm informed Mr. Beveridge by telephone early in October, 1975 that possibly a 'farm-out' of the Bland-Bertram lease could be made.[5] The plaintiff agreed to try and locate someone who might be interested in a farm-out after Mr. Beveridge told him to "see what he could do." The plaintiff contacted a prospect in Oneida and one in Crossville, Tennessee, but neither could make a commitment to undertake the farm-out.

"The plaintiff then contacted Gerald Erambert of Petroleum Development Corporation (PDC) at the latter's office in Subbright, Tennessee, on October 11 or 12, 1975.

"Mr. Erambert was manager of operations for PDC. Erambert ascertained from officials of PDC that they would 'definitely consider' the farm-out arrangement and he so advised the plaintiff. The plaintiff then advised Mr. Beveridge by telephone that PDC was interested in the farm-out.

"Mr. Beveridge then contacted PDC representatives and arranged a meeting between PDC's lawyers, J. G. Rhodes, Jr., and an associate of Western Reserves, C. G. 'Squeak' Collins, in Campbellsville, Kentucky, on October 20, 1975. The only other person present at that meeting was Mr. Erambert, PDC's employee. As a result of this meeting, a farm-out agreement was reached between the defendant and PDC and oil was subsequently discovered on the third well that PDC drilled. Production of oil in the Bland-Bertram property continues to this date."

---

fendant in East Tennessee. The per diem was raised to $50 in 1973 or 1974. The defendant admits that it had an oral agreement with the plaintiff to grant him a 2% ORI in leases the plaintiff acquired for the defendant during his employment. With regard to the lease under consideration, both parties agree that the plaintiff did not 'acquire' it for the defendant." [magistrate's footnote]

4. "The evidence showed that the value of a 2% ORI in the Bland-Bertram tract at the time of trial was approximately $70,000–$80,000." [magistrate's footnote]

5. "A 'farm-out' occurs when a leaseholder transfers to another an interest in the leasehold, for which the transferee promises to drill for oil and gas. The transferor retains an interest in his leasehold without incurring the costs of performing his own drilling, and the transferee obtains, or acquires, an interest in a leasehold at the cost of his drilling efforts. The term 'farm-in' is used to describe the transaction from the transferee's, or driller's, perspective. The Bland-Bertram farm-out and the Cox farm-in, discussed *infra*, were 'checkerboard' arrangements in which the parties divided the leasehold into half by the outright transfer of alternate parcels of the leasehold. The term is derived from the resulting appearance of the plat. *See, e. g.* Exhibit 9." [magistrate's footnote]