TENNECO OIL COMPANY, a
corporation, Appellant,

v.

Jim JOINER, d/b/a Joiner Oil
Co., Appellee.

No. 81–1198.

United States Court of Appeals,
Tenth Circuit.

Dec. 30, 1982.

Gregg R. Renegar, Kornfeld, McMillin, Phillips & Upp, Oklahoma City, Okl., for appellant.

Eddie N. Christian, Wiggins, Christian & Garner, Fort Smith, Ark., for appellee.

Before DOYLE and LOGAN, Circuit Judges, and BOHANON,* District Judge.

WILLIAM E. DOYLE, Circuit Judge.

The adversaries in the above case are Tenneco Oil Company, Plaintiff, and a land man employed by Tenneco, Jim Joiner. The dispute has arisen over alleged mishandling by Joiner of leases and bonus money. The relief sought by Tenneco is first, for damages based upon common law fraud with respect to the handling of the leases, and a judgment for constructive trusts based upon leases which, following his termination, Joiner obtained for his own use and benefit. The allegation as to this latter is that based on the prior employment, and the confidential material, there was a fiduciary relationship between Tenneco and Joiner and that he had no right to utilize the information growing out of his employment for his own benefit.

At the end of Tenneco's case the trial court granted the defendant's motion for a directed verdict as to the Tenneco claim in which it had sought damages for fraud or tortious breach of contract. As to the first claim the trial court granted a judgment in favor of defendant denying constructive trusts. The trial court did not make findings of fact and conclusions of law as required by Rule 52 of the Rules of Civil Procedure in a trial to the court.

The jurisdiction is based upon diversity, Tenneco being a Delaware corporation and having its principal place of business in Houston, Texas; Joiner, on the other hand, is a resident and citizen of Oklahoma.

---

* Honorable Luther L. Bohanon, Senior United States District Judge for the District of Oklaho- ma, sitting by designation.

## I.

*Discussion of the Basic Facts and Issues*

Joiner was employed to secure leases on behalf of Tenneco and to purchase those leases in his name until the lease block or buy outline was substantially acquired. This, according to Thompson, an expert presented by Tenneco, is a standard practice in the gas and oil industry and used by many independent oil operators, and most, if not all, of the major companies. The purpose is protection of the secrecy of the information on which the leasing effort is based.

In the first part of October, 1978, Tenneco entered into an employment agreement with Joiner under which the latter would acquire on Tenneco's behalf all of the oil and gas leases available within the area outlined on Tenneco's map or buy outline. This material was delivered to Joiner by one Steve Hord, a landman with Tenneco. It was the end product of lengthy research and study. Tenneco had told Joiner that its geologists considered the area to be profitable for oil and gas production. The allegedly confidential information furnished to Joiner, created, according to Tenneco, a fiduciary relationship which precluded Joiner from taking personal advantage of the confidential information gained from the employment. Joiner did not cease activities after termination of his employment with Tenneco. Instead, he used the map plus the information gained while he was in the employ of Tenneco to obtain thirty leases for himself. These actions constitute the factual outline for the constructive trust claim.

As indicated, there is a second principal claim in the case, that of common law fraud. Tenneco refers to it as tortious breach of contract. This arises from $137,-265.97 which Joiner obtained from Tenneco in the four months of his employment over and above the $125.00 per day plus expenses. Tenneco claims that this money was charged to Tenneco by Joiner's representation to Tenneco that it was reimbursement of sums paid by Joiner to lessors as bonuses for leases. Tenneco's position is that Joiner was fully compensated by payment for day work and expenses incurred in leasing; a total of $38,756.97 was paid from the first part of October through January. Eleven Thousand, Two Hundred Sixteen and 60/100 was said to have been paid based on day work and expense statements of Joiner. This was in addition to the $137,265.97, which he allegedly billed as bonus costs paid to the lessors.

Joiner does not seriously dispute the basic facts. He has acknowledged that he had received from Tenneco the $137,265.97 over and above the amount paid to the individual lessors of the leases taken in the name of Joiner Oil Company and assigned to Tenneco. He has also acknowledged that Tenneco Oil Company paid Joiner $125.00 per day salary plus expenses incurred in leasing, a total amount of $38,756.97 from and including October, 1978 through January, 1979. Of this amount, $11,216.60 represented the day work and expense statements of Jim Joiner. Also admitted by Joiner was that after the termination of his agreement with Tenneco Oil Company, he secured oil and gas leases within the area outlined by Tenneco Oil Company which was the subject of the agreement between the plaintiff and the defendant, and such leases subsequently acquired in this area are set forth in one of the exhibits. As mentioned, there was a total of thirty such oil and gas leases which Joiner retained for himself. Thus, Joiner has agreed that after his contract with Tenneco was terminated (it ended after a short life of four months) he nevertheless proceeded to use the Tenneco map and the information contained therein to obtain the mentioned thirty leases for himself.

It is the contention of Tenneco that the obtaining of the $137,000.00 plus dollars and the post employment obtaining of the leases was wholly unauthorized and resulted from deceitful actions by Joiner. Tenneco alleges that Joiner misrepresented that he had paid this sum to the lessors and that he was entitled to reimbursement but he had not.

The defendant has not been required to offer any evidence as yet so we are not entirely sure as to the position he takes;

however, we gain some inkling of it from the brief filed on his behalf. Emphasis there is placed on the fact that the letter employing him was a very brief writing. But the trial judge remarked that a writing should not be necessary in the oil and gas leasing business because a man's word should be sufficient in this area.

While no issue is taken as to the contention made by plaintiff regarding the $137,265.97, defendant offers sort of a confession and avoidance. He maintains that he was told by Mr. Hord of Tenneco that there was a $400,000.00 allotment for the project, and that if the money was not spent before the end of the year, it would have been returned to Houston's office. Seemingly this fact would permit him to obtain a part of it. He also says that he was authorized to get some people to help him, which he did. But the evidence shows that Tenneco paid the compensation which was paid to these employees. He also described prior employment; this employment had a duration of six weeks during the previous summer. Joiner also complains that he was asked to submit drafts. He refused to do so, and after that they allowed him to file bills. Apparently this is in answer to the obtaining of the $137,000.00 on the representation that he was required to pay that sum out in order to obtain the leases.

We describe briefly the facts submitted to us by Joiner but with the realization that the facts related have not been given under oath and are not a part of the record. Thus, it could not enter into this decision. We refer to it because it is the only factual commitment which Joiner has offered.

A number of witnesses testified on behalf of Tenneco. Included were Steven Andrew Hord, a professional landman who was employed by Tenneco; Frank Thompson, a geologist who was employed by Tenneco, and who testified regarding the program leading to the leasing. Bertha Hager, who also was employed by Tenneco as a land technician; her responsibility was to pay the brokers, to reimburse them for bonus money; Edward L. Snodgrass, of Houston, Texas, also a landman employed by Tenneco; he was in a position of supervisor for Tenneco; Terry George Parteger, who testified that he was a division landman with Tenneco's Mid-Continent Division in Oklahoma City; Charles A. Kellum, an independent landman who testified that he had been in the activity since 1952.

All of these witnesses testified at some length and no good purpose would be served from a detailed account; at the same time certain of the conclusions of fact in the case have been clarified.

*Hord* testified that he was a supervising landman and he differentiated between the hiring of a lease broker and a landman, and explained that different approaches are made in negotiating the contracts with them. He testified very definitely that the compensation to be paid to Joiner was $125.00 plus his expenses. It also became clear that working on a daily basis of $125.00 and working on a commission basis are mutually exclusive. Therefore, it is well known that if $125.00 per day is paid, or any amount is paid, this excludes the possibility of operating on a commission.

*Mr. Thompson,* the geologist, testified as to the planning work that was carried on by Tenneco prior to employment of Joiner to go out and obtain leases. He explained that the information developed in planning for a leasing program is definitely restricted information, because it is a competitive business, in which the information concerning the likelihood of oil and gas must be guarded. On the other hand, the landman, according to Mr. Thompson, is not given all of the underlying geological studies or scientific studies that have been made; he is given the sum total which is reflected in the plat.

*Bertha Hager* stated that she carried out the accounting practices in connection with this program. She differentiated between the lease broker and the landman. The latter is working for a specific amount per day, and he bills in a different way. She is the one who called attention to the fact that contrary to directions, drafts were not being filed by Joiner for expenses that he was claiming. She was required to scruti-

nize the bills as they came in. They used the bills for reimbursement of bonuses to pay him. At first she had no reason to believe, so she said, that the bills were incorrect, or that it was not an actual representation of what was paid to the individual landowners. She relied on the statements in order to make the payments. She also testified that she did not receive the leases which had been obtained until the end of January or the first part of February, and it was only then that she became aware of the fact that there were no drafts with them. The amount paid to the lessor on the draft if it differed from the total amount claimed for a bonus would have given the show away at once.

*Edward L. Snodgrass,* of Houston, Texas, testified that he came to Oklahoma City when he heard that a problem had developed with Joiner. He contacted Joiner and they arranged to have a meeting to talk about the case. They met at Henryetta, Oklahoma for lunch, and Snodgrass asked Joiner why there was a problem; that he needed to gain some insight on it. Joiner asked him "if he could tell him, friend to friend, or if he was going to have to tell him Jim Joiner to Tenneco. And I (Snodgrass) stated that since I was employed by Tenneco, if it related to business, if I knew it they knew it. And then he told me, well, he couldn't tell me, and we parted." Snodgrass also testified that Joiner was employed on a day work basis for Tenneco.

*Terry George Parteger* testified that he was the manager of the land department in the Tenneco Oklahoma City offices. Previously he had been a landman with Tenneco, since 1977. He had worked under Mr. Snodgrass and had one individual who was subject to his (Parteger's) supervision. He said that all relationships between Tenneco and lease brokers had been on a day work plus expenses or a commission basis, and that in some instances, "people have come in with what's been called an acreage submittal." If they have the latter arrangement they do not receive any day work, but they do receive expenses. He had limited contact with Joiner. This was in Arkansas. It was an acreage though which was owned by Joiner and which he agreed to sell to Tenneco. It was leased acreage, and they agreed to sell for $17.50 per acre, and the sale went through. Thus, there was no day work. He explained that for day work it is the agreement that payment is made even though the broker comes back empty handed, that is, when he does not succeed in obtaining any leases. He also said that where there is a lease broker on a day rate or day work basis, he is reimbursed for expenditures he has made for bonuses to land owners. The amount listed on the statement is the amount of the reimbursement. No day work was present in connection with the Arkansas property. This was a limited amount of acreage which was held by Joiner and was submitted for sale to Tenneco.

Parteger also testified that they had not succeeded in getting Joiner to utilize the drafts for reimbursement of money paid out, but that it was the drafts that ultimately resulted, at least in part, in the termination of employment of Joiner, although Tenneco had obtained about as much acreage as it needed.

*Charles A. Kellum,* an *independent* landman, said that he was thoroughly familiar with leasing activities. He had been employed by Tenneco previously as an independent broker to acquire leases for the company. He bought them both in the name of Tenneco and his own name. He said that as a general rule the company would have its own geologist come up with a prospect and they would give the brokers the prospect and have them check the records to see what is available, who all the ownership is. "They give us the amount that we can pay for leases, and most of the time it's a per diem type basis plus expenses," he said. Another way would be so much per acre. This is called a commission basis. Paid drafts are sent back to the company, and this is done to show the amount of money that is being spent. The broker furnishes them to exhibit proof of the amount he has paid to the owner, and that it has been paid for. When working on a day basis, he said that the amount was

$125.00 to $150.00 per day, although sometimes it would be much less, depending on the experience. Other expenses, such as secretarial and other help, is compensated by the company. Also, a lease broker is said by Kellum to have an obligation to obtain the acreage for the least amount of money possible. Kellum added that the plat and map were very confidential information, having been produced, according to him, by the geologists working for the company, and the landman working as an agent.

## II.

*Did Tenneco Succeed in Establishing a Prima Facie Case of Fraud or Deceit?*

Fraud or deceit, in an intentional sense, as distinguished from a negligent misrepresentation, is defined by the Restatement of Torts, 2d, § 525 as follows:

One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

The Restatement, Section 526, undertakes to define scienter which is essential to a fraudulent misrepresentation:

A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

Section 527 considers an ambiguous misrepresentation, and declares:

A representation that the maker knows to be capable of two interpretations, one of which he knows to be false and the other true is fraudulent if it is made: (a) with the intention that it be understood in the sense in which it is false, or (b) without any belief or expectation as to how it will be understood, or (c) with

reckless indifference as to how it will be understood.

In *Prosser,* the Law of Torts, the several elements of the tort of deceit are set forth starting at p. 685.

1. A false representation of fact made by the defendant

2. Knowledge or belief of the defendant that the representation was false (often called scienter).

3. An intention to induce the defendant to act or to refrain from acting in reliance.

4. Justifiable reliance by plaintiff upon the representation in taking action or in refraining from it.

5. Damage suffered by the plaintiff.

Our first question is directed to the sufficiency of evidence in the record to support the various elements of deceit.

*First,* there is evidence that defendant submitted statements to Tenneco which were greatly in excess of the actual amount paid to the lessors.

*Second,* he represented to the plaintiff that these amounts were the actual and exact amounts paid by the defendant for leases purchased on behalf of the plaintiff and received by the various lessors. There is evidence that a disparity exists between the amount that the defendant obtained from Tenneco. As a result of his submission of bills rather than drafts, the amount that he actually paid to the lessor as a bonus was not reported to Tenneco. This failure led to investigation. Careful study exposed the disparity between what he paid out and what he received from Tenneco. The amount submitted to Tenneco was in excess of the amount that was paid to the lessor for the lease.

*Third,* there was evidence of knowledge of belief of Joiner that the representation was false. Surely there are very strong inferences that he knew that he was billing for something which far exceeded his compensation. There is no evidence of any agreement that he could bill for an extra amount of money for himself, a bonus for getting the lease. On the contrary, he was

paid at the rate of $125.00 a day plus his expenses, and that has been made clear by testimony of all the witnesses in the case and the defendant does not disagree with that.

*Fourth,* there is evidence supporting the existence of an intention to induce the defendant to act or refrain from acting in reliance on the statement. The evidence speaks out that Joiner must have known that he was obtaining payment for claims which were not valid. In other words, insofar as the bills pretended payment to lessors the claims were false and he had to know of the falsity.

*Fifth,* there is evidence of intention to induce defendant to act or to refrain from acting in reliance. As shown, there was knowledge on the part of Joiner, and his action evidenced an intention to induce Tenneco to pay the amount for which it was billed, which was not the amount that was paid out.

*Sixth,* Tenneco justifiably relied upon the representations in taking action. There is evidence that these were seriously accepted and that payments were made until Tenneco became suspicious due to the fact that there were no drafts submitted. The drafts were a safeguard which gave some assurance that the exact amount paid out was being sought for reimbursement.

Did Tenneco suffer a loss as a result of the defendant's actions? The answer is that there is evidence that such a loss was suffered, and that loss was the difference between the amount that was paid as a bonus and the amount which was obtained from Tenneco. The excess $137,000 plus is admitted by Joiner.

■ Based upon the evidence offered through the witnesses called by the plaintiff, there is a *prima facie* case against the defendant Joiner. Judge Logan, in his concurring opinion, points out that the proof need not be clear and convincing; rather it must be substantial evidence or a preponderance of the evidence to make out a *prima facie* case under Oklahoma law. We are of the opinion that there has been estab-lished a *prima facie* case. Thus, all of the elements have been supported by substantial evidence.

■ If the defendant does not wish to testify in his own behalf he does not have to. This does not, however, preclude his being called as an adverse party upon retrial. Be that as it may, the plaintiff did present adequate evidence to satisfy each of the elements of the tort of deceit or fraud, and moreover, Tenneco is entitled to go to the jury on the presentation which was made. It follows that it was error of the trial court to direct a verdict, and the cause must be remanded for a new trial.

In Paragraphs 3A and 3B of the final pretrial order it was stipulated that Jim Joiner received from Tenneco Oil Company an amount of $137,265.97 over and above the amount paid to the individual lessors. The stipulation is as follows:

The parties pursuant to discovery are able to stipulate, agree and admit the following undisputed facts:

A. That Jim Joiner d/b/a Joiner Oil Co. received from Tenneco Oil Company an amount of One Hundred Thirty Seven Thousand Two Hundred Sixty-five Dollars Ninety-seven Cents ($137,265.97) over and above the amount paid to the individual lessors of those certain leases which were taken in the name of Joiner Oil Co. and assigned to the Plaintiff, Tenneco Oil Co.

B. That Tenneco Oil Company paid Joiner Oil Co. for day work and expenses incurred in leasing an amount of Thirty-eight Thousand Seven Hundred Fifty-six Dollars ($38,756.97) from and including the date of October, 1978 down through and including January of 1979, of which Eleven Thousand Two Hundred Sixteen Dollars Sixty Cents ($11,216.60) was paid based on day work and expense statements of Jim Joiner.

C. That Jim Joiner d/b/a Joiner Oil Co., after the termination of his agreement with Tenneco Oil Co., secured oil and gas leases within the area outlined by Tenneco Oil Co. which was the subject

of the agreement between the Plaintiff and Defendant and such leases subsequently acquired in this area are listed in Exhibit # 43 of the Defendant's Answers to Plaintiff's Interrogatories to Defendant, representing Thirty (30) oil and gas leases not assigned to Plaintiff.

## III.

*Was it Error for the Court to Enter Judgment for Joiner on the Claim Which Sought the Imposition of a Constructive Trust?*

We hold that the trial court's action was error. Our view is that the evidence presented was sufficient to establish, *prima facie,* that the plaintiff was entitled to have constructive trusts imposed. The defendant would have the right to refute Tenneco's evidence. However, if Joiner should fail to offer evidence in rebuttal, Tenneco would be entitled to have constructive trusts imposed.

■ The basic question is whether the Tenneco-Joiner relationship is a fiduciary one. As we view it, the evidence does establish the elements necessary to the adjudication of a trust imposed by law which is called a constructive trust. In order for a constructive trust to be declared there must exist not only a fiduciary relationship, but also the violation of the duty of loyalty and honesty which the relationship demands.

■ In the case of *Funk v. Tifft,* 515 F.2d 23 (9th Cir.1975), a prospective purchaser had made an offer on some property through a real estate broker. The broker, on behalf of himself and two others submitted an offer on the same land, and this offer was accepted by the seller. It was held that Idaho had long recognized the constructive trust as the appropriate remedy when a fiduciary violates his duties and takes property for his own use. *Id.* at 26. If a real estate broker is held to be a fiduciary subject to a constructive trust where he takes advantage of confidential information in order to purchase property, certainly a landman or lease broker who is entrusted with inside, confidential information is subject to the same result.

*Johnston v. Goggin,* 323 F.2d 36 (5th Cir. 1963), was a case in which some investors in oil and gas ventures sued the defendants whom they alleged were acting as their agents and confidantes and owed them complete disclosure and fair dealing in an attempt to find suitable oil and gas investments for the plaintiffs. The ruling of the court was that the defendants occupied a fiduciary relationship with reference to the plaintiffs, for the violation of which equity required an accounting. The trial court imposed a constructive trust by reason of the fact that the defendants had undertaken to find suitable oil and gas investments for the plaintiffs. It was held that the relationship was fiduciary in reference and equitable considerations dictated that the defendants be held accountable. Thereupon a constructive trust on a portion of the money which the defendants received for oil payment interests was entered in favor of the plaintiffs.

In *Maryland National Bank v. Tower,* 374 F.2d 381 (4th Cir.1967), the Fourth Circuit imposed a constructive trust upon the proceeds of a life insurance policy in the hands of a widow in favor of the employer's pension plan trustee. Under Maryland law, a constructive trust is imposed to avoid unjust enrichment arising out of mistake, regardless of whether there is fraud, and even though the claimant has suffered no actual loss and the loss was less than the fiduciary's gain.

In *Bull v. Logetronics, Inc.,* 323 F.Supp. 115 (E.D.Va.1971), it was held that the duty to be faithful does not cease when the employment ends. *Id.* at 133. An employee has a duty not to reveal confidential information obtained through his employment and not use such confidential information after he has left the employment. An additional holding was that a former employee's conduct need not be fraudulent in order to establish a constructive trust with respect to money and rights received by the former employee because of use of information and documents gained as an employee. *Id.* at 134.

A confidential relationship was held to exist between an oil company and its landman in *Chisholm v. Western Reserves Oil Co.,* 655 F.2d 94 (6th Cir.1981). In that case the landman was allowed to recover a two percent royalty. The violation of the fiduciary relationship had been by the company.

A Texas case involving abuse of a fiduciary relationship resulting in the acquisition of property unconscionably is *Palmer v. Fuqua,* 641 F.2d 1146 (5th Cir.1981). In *Palmer,* a limited partner sued for and obtained a constructive trust on an undivided one-sixth interest in an oil and gas lease acquired by the general partner.

■ It does not appear that Oklahoma law on this subject is different from the law of other states. This was recognized in *Cacy v. Cacy,* 619 P.2d 200 (Okl.1980). In that case the stepsons of a testator sought to impose a resulting trust or constructive trust on property in which legal title had been vested in the testator, their stepfather. The Supreme Court of Oklahoma held that the stepsons had not stated a cause of action for resulting or constructive trust. It said that a constructive trust is an involuntary or implied trust by operation of law, and is imposed against one who by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds legal title to property, which he ought not, in equity and good conscience, hold and enjoy.

Another Oklahoma case which recognizes the remedy of constructive trust is *Wooten v. Melton,* 631 P.2d 1337 (Okl.1981). It was there held that a constructive trust may be implied when one, through some manner of wrongdoing, such as fraud, abuse of confidences or trick, obtains title to property. The question in Wooten was whether the grantor of certain land was the beneficial owner of a life estate interest in one half the income from the oil and gas production from land conveyed years earlier.

■ A constructive trust was imposed in an equitable action in order to prevent one person from securing unfair or unjust advantage of another, where such has been made possible by reason of a relationship in which that person has been placed by the other, or by some fiduciary relationship. *Goodwin v. Beard,* 434 P.2d 192 (Okl.1967). The suit was brought to establish a constructive trust based upon an oral agreement on an undivided mineral interest.

■ There was evidence in the case at bar that the defendant Joiner did, indeed, violate the trust that had arisen by reason of his employment. He did this during the period of his employment, but after the employment he continued to operate in the areas which had been researched and examined by Tenneco, and he signed up at least thirty leases and possibly more after his employment was terminated. He used knowledge and information obviously that he had acquired from Tenneco in order to gain the leases. Accordingly, it is our conclusion that a *prima facie* case was established here in the constructive trust count, and that the trial court was in error in entering the judgment in favor of *Joiner,* under the evidence which established that Joiner had violated his trust in various ways. Joiner was shown to have utilized the position he had and the information he had thereby gained in order to obtain leases on his own behalf. Unquestionably this was misuse of confidential information, and there exists a *prima facie* case with entitlement to a constructive trust upon the properties which were so obtained or the proceeds.

The deceit and fraud case which we discussed previously is an action at law and plaintiff is there entitled to have a jury trial. If Tenneco recovers it will be a money judgment awarded by the jury.

■ The constructive trust claim rests on different facts, and it arises under equity jurisprudence. The plaintiff is not entitled to have a jury trial when seeking this remedy. This does not mean that both claims cannot be tried simultaneously. The court must make and enter findings of fact

and conclusions of law in accordance with Rule 52 of the Rules of Civil Procedure.

The plaintiff *is* entitled to a jury in the fraud or deceit case.

Accordingly, the judgments of the district court are reversed. The cause is remanded for a new trial in accordance with the foregoing opinion.

It is so ordered.

BOHANON, District Judge, concurs in this opinion.

LOGAN, Circuit Judge, concurring:

While I agree with much of Judge Doyle's opinion, my views differ sufficiently that I write separately.

## I

Tenneco sued for the $137,265.97, which it alleges was paid because of Joiner's fraudulent reporting of bonus payments. Tenneco contends that it hired Joiner to be its agent to acquire leases and that Joiner's only compensation was to be the day rate plus expenses, including reimbursement of only the exact amounts paid out in bonuses. Judge Doyle is correct that Joiner never fully revealed his theory why he was entitled to keep the $137,265.97. But Joiner's theory apparently is that Tenneco was "to buy the leases Joiner obtained in between $40 and $60 per acre." R. IV, 77–78. Joiner apparently claims that if he could acquire the leases at less than the $40 per acre bonus Tenneco had authorized, he would receive the difference between the bonus he paid and the $40, in addition to the day rate and expenses.

The trial court, citing *inter alia, Barnett v. Life Insurance Company of the Southwest,* 562 F.2d 15 (10th Cir.1977); *Tyler v. Hartford Accident and Indemnity Co.,* 195 Okl. 523, 159 P.2d 722 (1945); *Johnson v. Caldwell,* 180 Okl. 470, 71 P.2d 620 (1937), held that Tenneco had the burden of proving fraud by clear and convincing evidence, and that Tenneco did not meet its burden. Tenneco asserts that the court erred in requiring clear and convincing proof. I agree. Joiner was Tenneco's lease buying agent and had a fiduciary relationship to his principal. When a principal sues its agent for breach of fiduciary duty, the "clear and convincing evidence" standard is not applicable.

"'Fraud and undue influence will not be presumed, but ordinarily must be proven by clear, cogent and convincing testimony. However, where fraud and undue influence are alleged and facts sufficient to show inadequacy of consideration and a confidential relationship are proven, the one occupying such a position of confidence will be required to go forward and make a full and complete disclosure showing absolute good faith and that there was no fraud or undue influence practiced in a transaction between the parties.'"

*Renegar v. Staples,* 388 P.2d 867, 871–72 (Okl.1964) (quoting *Owens v. Musselman,* 190 Okl. 199, 121 P.2d 998 (1942)).

Tenneco also argues that once it shows the existence of a confidential relationship, Joiner has the burden of showing that he did not abuse the relationship. But that would be true only after Tenneco has adduced evidence that Joiner acted improperly with regard to the leasehold reimbursements.

"Generally the burden of proof, or the burden of going forward with the evidence, does not shift to the person holding the position of trust and confidence *until his opponent has presented some evidence or circumstances which indicates that he has been abused, defrauded,* subjected to undue influence, or overreached."

*Renegar v. Staples,* 388 P.2d at 871 (emphasis added). Joiner argues that his arrangement with Tenneco entitled him to the $137,265.97 as part of his compensation, as one of the terms of his employment. Before Tenneco can show that its agent was a wrongdoer, Tenneco must carry the burden of proving the terms of the compensation agreement.

The principal evidence bearing on the compensation arrangement between the parties was Steven Hord's testimony. Hord

testified that he came to work for Tenneco about October 1, 1978, a few days before the Joiner transaction, and that this was the first employment transaction he had entered into on behalf of Tenneco. He testified that the contract was oral except for the letter quoted above and the accompanying map. R. IV, 54. Hord stated that he did not remember the specifics of the conversation, *id.,* but assumed he discussed Tenneco's various reimbursement voucher forms "because that is the general course of action that I would have taken," *id.* at 55. He admitted that nothing in the letter specified Joiner's compensation, and he gave the following additional testimony:

"Q. Did you ever tell Mr. Joiner, at any time, that he would not be entitled to make a profit on the leases?

A. Not specifically. I don't believe I did.

Q. All right, sir. It would—You never told him that all he was going to get paid for the day work?

A. No, sir, I did not.

Q. All right. Did you know at the time that you were talking with Mr. Joiner and entering into this agreement that he had worked for Tenneco previously?

A. No, sir, I did not.

. . . .

Q. Did you ever, at any time, tell Mr. Joiner that he would have to furnish drafts?

A. I cannot recollect that I did or did not.

Q. Do you know whether or not Mr. Joiner told you he did not furnish drafts where he took the leases in his name?

A. No, sir, I cannot specifically recall any conversation relative to drafts."

R. IV, 73, 76.

Hord testified that he thought Joiner was to receive only $125 per day plus expenses and exact reimbursement for bonuses paid and that he would not have hired Joiner if payment was to be on another basis. Other witnesses stated that other independent landmen employed on a day-rate basis received reimbursement only for the actual amount paid for landowner bonuses. But Tenneco witnesses also admitted hiring landmen on a per acre commission basis without payment of expenses, R. IV, 116; they also admitted that sometimes Tenneco purchases by "acreage submittals" from individual landmen who have acquired leases for their own account and negotiate the resale of the leases to Tenneco. R. IV, 126–27.

Much of the cross-examination concerned Joiner's prior employment with Tenneco during June and July of 1978. The evidence showed that in his accounting to Tenneco during the prior employment period Joiner never provided copies of drafts he utilized to pay landowner bonuses, just as he never provided such drafts during the employment period at issue in this appeal. Tenneco's employee Terry Pargeter admitted that when Tenneco acquires leases either by reimbursement of bonuses or by acreage submittals it uses the same reimbursement form, and that the form indicates only the amount Tenneco is paying the lease broker for the lease. R. IV, 147–49.

If reasonable minds could differ as to what the compensation arrangement between Joiner and Tenneco was, the directed verdict was improper and the claim should have been submitted to the jury. The trial judge indicated in his opinion that the case might be sufficient to be submitted to the jury if a preponderance standard were applied. After emphasizing that the standard of proof in actions for fraud is high, the court stated:

"Here there is no evidence of what the deal was. There is no evidence of what the contract with this defendant was. The most that can be said from the testimony is *according to plaintiff's witnesses* and their conclusions of what it must have been.

There were suspicious circumstances regarding the defendant's conduct, by his refusal to talk to Mr. Snodgrass on an official basis, by his refusal to submit

drafts as demanded, but this is not sufficient, and a verdict in plaintiff's favor would have to be set aside under the quality and quantity of the proof in this case.

It is somewhat regrettable but inescapable conclusion to be reached here, and the only proper conclusion to be reached, in my judgment. *The standard of proof has not been met as it might have been under a less demanding theory of recovery, but* that was the plaintiff's choice, and the standards of his choice must be applied.

Accordingly, the Motion for Directed Verdict of the defendant is sustained as to the third cause of action, [for the $137,265.97] and judgment is entered in defendant's favor on the first cause of action, which was for the constructive trust."

R. IV, 210–11 (emphasis added).

Despite uncertainties in Tenneco's proof, I believe Tenneco presented sufficient evidence to have the jury determine the lease bonus issue. Tenneco presented Hord's testimony and the testimony of other witnesses concerning the general understanding of day-rate compensation in the industry. Also, the only form in the record showing Tenneco's payment for bonuses is titled "STATEMENT FOR REIMBURSEMENT OF BONUS" and refers to "reimbursement for bonus paid." Def.Ex. 3. I do not think Joiner's failure to put on evidence after Tenneco rested required a directed verdict for Tenneco; the cross-examination and the exhibits dealing with Joiner's earlier employment were sufficient to place the propriety of Joiner's conduct in issue. For these reasons I support Judge Doyle's reversal on this count for a new trial.

## II

On the issue of whether a constructive trust should be imposed on leases Joiner acquired after termination of his relationship with Tenneco, the trial judge was the trier of fact. I agree with Judge Doyle that the trial judge did not make findings of fact on this issue sufficient under Fed.R.

Civ.P. 52(a) to permit us to review his determination. But I am not as certain as Judge Doyle that Joiner's purchase of the leases after termination of his agency relationship with Tenneco justifies the imposition of a constructive trust.

Tenneco relies upon the general rule that an agent cannot enrich himself, other than by the amount of his agreed-upon compensation, while he serves the principal. Most decisions cited by Tenneco in support of its argument are cases in which the agent took advantage of his position during his employment. The instant case is different; the agency had terminated. A fiduciary duty does not extend beyond the employment period unless the agent improperly uses confidential information acquired during the relationship. Restatement (Second) of Agency § 396 (1958). Thus, Tenneco's claim turns on whether the map designating certain areas in which Tenneco wished to acquire leases constituted confidential information that Joiner should not have been permitted to use outside the agency relationship.

For purposes of criminal law, Oklahoma has defined trade secrets as "the whole or any portion or phase of any list of customers or prices or any scientific or technical information, design, process, procedure, formula or improvement which is secret and of value." Okla.Stat.Ann. tit. 21, § 1732(B)(c) (West Supp.1982–1983). However, in a civil suit Oklahoma may apply a less restrictive definition. *See* Uniform Trade Secrets Act § 1(4) (1979); Restatement of Torts § 757 (1939).

The parties have cited no Oklahoma authority for the proposition that confidential information is subject to restrictions against disclosure and use after termination of the fiduciary relationship. However, in appropriate circumstances such restrictions may apply.

"Unless otherwise agreed, after termination of the agency, the agent:

. . . .

(b) has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in

competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent is entitled to use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent;

(c) has a duty to account for profits made by the sale or use of trade secrets and other confidential information, whether or not in competition with the principal;"

Restatement (Second) of Agency § 396 (1958). Holding Joiner to the rule set forth above may have the effect of inhibiting him in the exercise of his profession. The Oklahoma legislature has exhibited hostility to contracts that restrain one's exercise of his profession. See Okla.Stat. tit. 15, § 217 (1966). Further, Joiner's use of the information gained during his employment may not injure Tenneco. See R. IV, 65–66. In these circumstances restraining use or disclosure of confidential information may be unreasonable.

I have found no factually similar Oklahoma or other case addressing this issue. I think the trial judge should address whether Oklahoma would find the instant case one appropriate for a constructive trust, making findings in compliance with Rules 52(a) and 58 that we can review if appealed. Therefore, I support Judge Doyle's reversal for a new trial on this issue also.