2002 ND 205

James GAWRYLUK, Plaintiff and Appellee,

v.

A.M. POYNTER; unknown heirs of A.M. Poynter; Mineral Opportunities Inc.; Bayou Production Company, Inc.; Catherine M. Viola; William H. Plagemen, Jr., Trustee of the Catherine M. Viola Trust dated August 2, 1991; Bejie A. Vinson; Glen S. Cade; Jerry Belmonte; Betty B. Maranto; Beth J. Crafton; Paul H. Crafton; Alex H. Keller; any other heirs or devisees of G.A. Crafton, aka Grover A. Crafton; all other persons unknown claiming an estate or interest in or lien or encumbrance upon the property described in the Complaint, Defendants,

William H. PLAGEMEN, Jr., Trustee of the Catherine M. Viola Trust, Defendant and Appellant.

No. 20020121.

Supreme Court of North Dakota.

Dec. 20, 2002.

John W. Morrison, Fleck, Mather & Strutz, Bismarck, N.D., for defendant and appellant.

Michael J. Maus, Hardy, Maus & Nordsven, P.C., Dickinson, N.D., for plaintiff and appellee.

KAPSNER, Justice.

[¶ 1] William H. Plagemen, Jr., the trustee of the Catherine M. Viola Trust ("Viola Trust"), appealed from a judgment quieting title to twenty-five mineral acres in a tract of land in Billings County to James Gawryluk. We hold an August 17, 1951, mineral deed from A.M. Poynter, the Viola Trust's predecessor in interest, to G.A. Crafton, Gawryluk's predecessor in

interest, entitled Gawryluk to quiet title to the twenty-five mineral acres. We affirm.

## I

[¶ 2] In 1930, the State, through a mortgage foreclosure, acquired the surface and all the minerals under a tract of land in Billings County. In 1946, the State quitclaimed its interest in the land to Ralph Barnhart. Although the State's quitclaim deed did not include a mineral reservation, the parties agree the State reserved a fifty per cent interest in the minerals under that land by operation of law and Barnhart received a fifty per cent interest in the minerals. *See* N.D.C.C. § 38–09–01 (providing deed from State after February 20, 1941, which does not contain reservation of fifty per cent of minerals underlying transferred land must be construed to include such reservation). In an August 3, 1951, mineral deed, Ralph and Florence Barnhart conveyed to Poynter "an undivided Four/Fifth 4/5th interest in and to all of the oil, gas and other minerals in and under" the land. The parties agree that conveyance resulted in the Barnharts conveying their entire fifty per cent mineral interest in the land to Poynter.

[¶ 3] In an August 17, 1951, mineral deed that "warrant[ed] said title" to Crafton, Poynter conveyed to Crafton "an undivided Four–Fifth's (4/5ths) interest in and to all of the oil, gas and other minerals in and under" the tract of land in Billings County. On September 12, 1953, Poynter executed a mineral deed, which was recorded on September 17, 1953, and stated

(The purpose of this deed is to correct the erroneous description of the amount of minerals conveyed by the Grantor to G.A. Crafton, Grantee, in that mineral deed dated August 17th, 1951, ... Said mineral deed incorrectly described the amount of minerals conveyed as follows:

Four–Fifths (4/5ths) under the above described lands. When in fact, the minerals intended to be conveyed were 192 mineral acres, and only 192 mineral acres under the above described lands.) 192/480ths mineral interest.

[¶ 4] On October 1, 1953, Poynter executed a "Correction Mineral Deed," which was recorded on October 5, 1953, and stated

(The purpose of this Deed is to correct the erroneous description of the amount of minerals conveyed by the Grantor to G.A. Crafton, grantee, in that mineral deed dated August 17th, 1951, ... Said Mineral Deed incorrectly described the amount of the minerals conveyed as fol: Four–Fifths (4/5ths) under the above described lands. When in fact, the minerals intended to be conveyed were Four–Fifths (4/5ths.) of Fifty Per Cent (50%) and only 4/5ths.) of 50% in and under the above described lands. This Deed is also to clarify the Deed to same grantee dated Sept. 12th 1953.

[¶ 5] The issue in this appeal involves competing claims to twenty-five mineral acres under the land in Billings County, which in turn depends on the quantity of mineral interests conveyed by Poynter to Crafton in the August 17, 1951, mineral deed. Gawryluk, the successor in interest to Crafton, claims Poynter conveyed all of his mineral interests in the 1951 mineral deed, and his subsequent conveyances to the predecessors in interest of the Viola Trust were ineffective to convey any mineral interests. Gawryluk thus claims ownership of the disputed twenty-five mineral acres. The Viola Trust, the successor in interest to Poynter, claims Poynter intended to convey only four-fifths of his one-half mineral interest to Crafton, and that intent was established by the correction deeds, subsequent conveyances to third parties by both Poynter and Crafton, and the 1959

probate of Crafton's estate, which resulted in the distribution of an undivided 56/480 mineral interest to Crafton's wife and corresponded to Crafton receiving a four-fifth of one-half interest in the land minus Crafton's conveyances to other third parties. The Viola Trust thus claims Poynter's subsequent conveyances to the predecessors in interest of the Viola Trust established its claim to the disputed twenty-five mineral acres.

[¶ 6] Gawryluk brought this quiet title action to establish ownership to the disputed twenty-five mineral acres. The trial court initially denied Gawryluk's motion for summary judgment, concluding "the documents [were] ambiguous and that the parties [were] therefore entitled to offer parol evidence." After a bench trial at which the parties stipulated to the facts, the court decided that, in construing the August 17, 1951, mineral deed, it was not appropriate to consider the two 1953 correction deeds, because Crafton did not join Poynter in the execution of those two deeds, and Poynter did not directly deliver those deeds to Crafton for acceptance. The court said Poynter's recording of the 1953 correction deeds may have created a rebuttable presumption of delivery to and acceptance of the deeds by Crafton, but the court declined to apply that presumption because it concluded neither of the two correction deeds were beneficial to Crafton. The court decided, without the 1953 correction deeds, the August 17, 1951, deed was unambiguous. The court concluded Poynter conveyed all of his mineral interests to Crafton in the 1951 deed, and Poynter had no mineral interests to convey to the Viola Trust's predecessors in interest after the 1951 conveyance to Crafton. The court thus quieted title in the disputed twenty-five mineral acres to Gawryluk.

## II

[¶ 7] The Viola Trust argues the trial court erred in concluding the August 17, 1951, mineral deed conveyed all of Poynter's mineral interests to Crafton. The Viola Trust argues the 1951 deed contained a latent ambiguity and parol evidence establishes Poynter only intended to convey four-fifths of his one-half mineral interest in the land. Gawryluk responds the 1951 mineral deed unambiguously conveyed all of Poynter's mineral interests to Crafton, and in this quiet title action, extrinsic evidence was not admissible to alter that unambiguous language. Gawryluk argues even if extrinsic evidence is considered in construing the deed, that evidence only shows Poynter's attempt to change the conveyance after he discovered the State owned fifty per cent of the minerals in the land.

[¶ 8] We have said the primary purpose in construing a deed is to ascertain and effectuate the grantor's intent. *Mueller v. Stangeland*, 340 N.W.2d 450, 452 (N.D.1983) (citing *Malloy v. Boettcher*, 334 N.W.2d 8, 9 (N.D.1983)). However, deeds that convey mineral interests are subject to the general rules governing contract interpretation, *Minex Resources, Inc. v. Morland*, 467 N.W.2d 691, 696 (N.D. 1991), *Miller v. Schwartz*, 354 N.W.2d 685, 688 (N.D.1984), *Mueller*, at 452, and we construe contracts to give effect to the parties' mutual intentions. *Mueller*, at 452. Because we construe mineral deeds to give effect to the parties' mutual intentions, we decline the Viola Trust's suggestion to limit our inquiry in this case to the intent of the grantor, Poynter.

[¶ 9] When the language of a deed is plain and unambiguous and the parties' intentions can be ascertained from the writing alone, extrinsic evidence is inadmissible to alter, vary, explain, or change the deed. *See Minex*, 467 N.W.2d at 696. If a contract is ambiguous, extrin-

**404**

sic evidence may be considered to clarify the parties' intentions. *Minex,* at 696. A contract is ambiguous when rational arguments can be made for different interpretations. *Minex,* at 696; *Mueller,* at 453. Whether a contract is ambiguous is a question of law for the court to decide. *Minex,* at 696. On appeal, we independently review a contract to determine if it is ambiguous. *Id.*

[¶ 10] In *Harney v. Wirtz,* 30 N.D. 292, 304–07, 152 N.W. 803, 807–09 (1915), this Court explained the historical and technical definitions of latent and patent ambiguities in the context of considering whether or not a contract was a chattel mortgage or a real estate mortgage. *See In re Johnson's Estate,* 214 N.W.2d 112, 115 (N.D.1973) (citing *Harney* for "historical and technical meanings" of latent and patent ambiguities and concluding test for determining whether document is ambiguous is whether good arguments can be made for contrary interpretations). In *Harney,* 30 N.D. at 304–05, 152 N.W. at 807–08, this Court said a latent ambiguity may, in limited circumstances, be explained by extrinsic evidence. This Court defined a latent ambiguity as an ambiguity arising when a writing appears unambiguous on its face, but some collateral matter makes the meaning uncertain. *Id. See Thompson v. Thompson,* 391 N.W.2d 608, 610 (N.D.1986) (concluding contract for deed contained latent ambiguity about right to receive proceeds from disposal of salt water in well on land, which could be explained by extrinsic evidence). In *Harney,* 30 N.D. at 306, 152 N.W. at 808, this Court held language in an instrument unambiguously created a chattel mortgage, not a real estate mortgage, and extrinsic evidence was not admissible to convert the chattel mortgage to a real estate mortgage:

The ambiguity arising in this case—if there is one—is an inherent uncertainty appearing on the face of the instrument, and arises from the defective, obscure, or insensible language used. It seems clear that no ambiguity exists which can be explained by parol. The only doubt existing in this case, if any, is as to the intention of the parties. This is not such an ambiguity as can be explained by parol. When the intention of the parties is clearly expressed, and a doubt exists, not as to the intention, but as to the object to which the intention applies, it is a latent ambiguity. The evidence offered by plaintiff was not to explain an ambiguity, but merely to add something to the contract. The purpose of the evidence was to convert a chattel mortgage into a real estate mortgage. This is not explaining an ambiguity, but varying the terms of a written contract, and creating a new contract by parol entirely different and variant from the written contract.

Under *Harney,* parol evidence may be used to explain a latent ambiguity, but may not be used to create a new or a different contract. *See In re Kahoutek's Estate,* 39 N.D. 215, 222–23, 166 N.W. 816, 818 (1918) (stating terms of will that conveys property which testator does not own are clear and definite and fact testator does not own property does not render will indefinite or permit a court to make a new will for testator).

[¶ 11] Here, on its face, Poynter's August 17, 1951, deed to Crafton clearly and unambiguously conveyed an "undivided Four–Fifth's (4/5ths) interest in and to all of the oil, gas and other minerals in and under" the land in Billings County. Under that deed, Poynter conveyed more mineral interests to Crafton than Poynter actually owned. We reject the Viola Trust's claim that, in this action to determine title, Poynter's overconveyance of mineral inter-

ests to Crafton was a latent ambiguity which permitted the introduction of extrinsic evidence. Rather, in cases involving an overconveyance of minerals, courts have commonly applied the rule of construction from *Duhig v. Peavy–Moore Lumber Co.*, 135 Tex. 503, 144 S.W.2d 878 (1940).

[¶ 12] In *Duhig,* 144 S.W.2d at 878–79, a third party owned an outstanding one-half mineral interest in certain land, and the grantor owned the surface and the remaining one-half mineral interest. The grantor conveyed the surface to the grantee by warranty deed but reserved one-half of all the minerals under the land. *Id.* The grantor and grantee both claimed the one-half mineral interest that was not owned by the third party. *Id.* at 879. The Texas Supreme Court concluded the grantee owned the surface and a one-half mineral interest, the third party owned the outstanding one-half mineral interest, and the grantor owned nothing. *Id.* at 880. In reaching that conclusion, the court employed a two-step analysis under principles of estoppel. *Id.* The court observed the grant clause gave the grantee all of the surface and a one-half mineral interest but the reservation clause reserved a one-half mineral interest in the grantor. *Id.* Because the grantor purported to retain a one-half mineral interest and the other one-half mineral interest was owned by a third party, the grantor breached the clause warranting title to a one-half mineral interest. *Id.* By analogy to the doctrine of estoppel by deed against assertion of an after-acquired title, the court held the grantor was estopped to assert the reservation of a one-half mineral interest. *Id.*

[¶ 13] In 1 William & Meyers *Oil and Gas Law,* § 311, p. 580.39 (2001) the authors explain the *Duhig* rule:

The *Duhig* rule says that where a grantor conveys land in such a manner as to include 100% of the minerals, and then reserves to himself 50% of the minerals, the reservation is not operative where the grantor owns only 50% of the minerals. The deed is construed as undertaking the transfer of 50% of the minerals to the grantee. Both this grant and the reservation cannot be given effect, so the grantor loses because the risk of title loss is on him.

The effect of *Duhig* is that a grantor cannot grant and reserve the same mineral interest, and if a grantor does not own a large enough mineral interest to satisfy both the grant and the reservation, the grant must be satisfied first because the obligation incurred by the grant is superior to the reservation. The interpretation of deeds within the framework of the *Duhig* rationale provides certain and definite guidelines in the interpretation of property conveyances and in title examinations. *See* 1 Williams & Meyers, at § 313, p. 616–616.1.

[¶ 14] This Court's application of *Duhig* has been based on estoppel by warranty, a subset of estoppel by deed, which precludes a warrantor of title from questioning the title warranted. *Miller v. Kloeckner,* 1999 N.D. 190, ¶ 13, 600 N.W.2d 881 (citing *Mau v. Schwan,* 460 N.W.2d 131, 134 (N.D.1990)). *See also Acoma Oil Corp. v. Wilson,* 471 N.W.2d 476, 479–80 (N.D.1991); *Sibert v. Kubas,* 357 N.W.2d 495, 497 (N.D.1984). In *Miller,* at ¶ 16–18 we recognized the rationale from *Duhig* may apply to a deed with no warranty provisions, and the key question is not what the grantor purported to retain for himself, but what the grantor purported to give the grantee. *See* 1 Williams & Meyers, at § 311, p. 580.34.

[¶ 15] We conclude the *Duhig* rationale applies to Poynter's overconveyance of minerals to Crafton, and in this action to determine title, principles regarding certainty and the *Duhig* rationale preclude

the admission of extrinsic evidence.[1] We reject the Viola Trust's claim that Poynter's 1951 deed to Crafton is ambiguous. Under the *Duhig* rationale, we conclude the 1951 deed is not ambiguous and extrinsic evidence was not admissible to change the meaning of the clear and unambiguous language in that deed.

### III

[¶ 16] The Trust alternatively argues the trial court erred in deciding the 1953 correction deeds did not vest Poynter with one-fifth of a one-half mineral interest in the land. The Trust argues the two 1953 correction deeds modified the 1951 mineral deed, and the correction deeds were delivered to and accepted by Crafton. The Trust argues Poynter's recording of the 1953 correction deeds raised a presumption of delivery to and acceptance of the deeds by Crafton. The Trust argues even if that presumption is not applicable, Crafton's failure to renounce the correction deeds and his estate's affirmation of the correction deeds during probate constitutes acceptance and ratification of the correction deeds.

[¶ 17] In *CUNA Mortgage v. Aafedt*, 459 N.W.2d 801, 804 (N.D.1990), we cited *Dinius v. Dinius*, 448 N.W.2d 210, 216 (N.D.1989), for the principle that the recording of a deed may create a rebuttable presumption of delivery to and acceptance by the grantee. In *CUNA*, at 804, we recognized that presumption only arises when the deed is beneficial to the grantee and not when the deed is a burden on the grantee. The Viola Trust claims the two correction deeds were not burdensome to Crafton. The Viola Trust argues correction deeds that express the parties' true intent do not diminish the grantee's rights,

and instead allow for the proper construction of the original deed.

[¶ 18] Neither *CUNA* nor *Dinius* involved situations where the *Duhig* rationale applied, and a grantor purported to unilaterally correct a *Duhig* result after an initial overconveyance. Here, because both correction deeds purported to reduce Crafton's mineral interests under the plain language of the August 17, 1951, mineral deed and the *Duhig* rationale, we reject the Viola Trust's claim the correction deeds were beneficial to Crafton. The trial court did not err in concluding the recording presumption was not applicable to the 1953 deeds.

[¶ 19] In *CUNA*, 459 N.W.2d at 804, we also stated the failure to renounce a deed with knowledge of its existence may be sufficient to show a grantee accepted the deed. However, in *CUNA*, at 804, we concluded a grantee's four-week delay in making a formal objection to a recorded quitclaim deed was insufficient to raise a factual dispute about laches or estoppel.

[¶ 20] We are not persuaded the record from the subsequent probate of Crafton's estate in 1959 establishes Crafton knew of or accepted the 1953 correction deeds. The *Duhig* rationale provides certainty for real property conveyances and that certainty would be seriously undermined if subsequent probate proceedings negated a *Duhig* result. This is not a reformation action. *See Mau*, 460 N.W.2d at 134–36; *Sibert*, 357 N.W.2d at 499. The effect of the Viola Trust's argument would be to convert this quiet title action to a reformation action, and we decline that invitation.

[¶ 21] We conclude Gawryluk was entitled to quiet title to the twenty-five miner-

---

1. We have recognized the *Duhig* rationale does not preclude the introduction of extrinsic evidence relevant to a reformation claim.

*Sibert*, 357 N.W.2d at 499; *Mau*, 460 N.W.2d at 134–36.

al acres under the 1951 deed, and we therefore affirm the judgment.

[¶ 22] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, WILLIAM A. NEUMANN, and DALE V. SANDSTROM, JJ., concur.