2003 ND 65

**Thomas SPAGNOLIA, M.D., Plaintiff and Appellee,**

v.

**Mark S. MONASKY, M.D., Defendant and Appellant.**

**and**

**Dakota Neurosurgical Associates, P.C. ("DNA"), a North Dakota professional corporation, Defendant, Third–Party Plaintiff and Appellant,**

v.

**Bismarck Neurosurgical Associates, P.C., Third–Party Defendant.**

No. 20020203.

Supreme Court of North Dakota.

April 22, 2003.

Rehearing Denied June 9, 2003.

Rebecca S. Thiem (argued) and James S. Hill, Zuger Kirmis & Smith, Bismarck, ND, for plaintiff and appellee.

Clark J. Bormann, Bormann & Myerchin, LLP, Bismarck, ND, for appellants.

NEUMANN, Justice.

[¶ 1] Dakota Neurosurgical Associates, P.C. ("DNA") and Mark S. Monasky, M.D., have appealed from the judgment in an action brought by Thomas Spagnolia, M.D., and from an order allowing costs and fees, denying a motion to unseal court records, and denying a motion for judgment as a matter of law, for a new trial, and to amend the findings and judgment. We affirm in part, and reverse in part.

[¶ 2] In 1996, Monasky, a Bismarck neurosurgeon and sole shareholder, director, and officer of DNA, contacted Spagnolia, a Kentucky neurosurgeon, about practicing in Bismarck. Spagnolia met with Monasky and DNA's accountant in November 1996. On behalf of DNA, a Bismarck attorney drafted an employment agreement, which was reviewed by Spagnolia's Kentucky attorneys. Monasky and Spagnolia made some changes to the draft agreement and executed it on January 17, 1997.

[¶ 3] The agreement, which specified Spagnolia's employment was to run from January 13, 1997, until May 31, 1998, provided:

9. *Revenues for Professional and Other Services:* All revenues and collected receivables which result from any direct patient care or other professional services of [Spagnolia] rendered through [Spagnolia's] practice of medicine shall be the property of [DNA]. . . . All revenues derived from the services provided by [Spagnolia] pursuant to Paragraph 7 above shall be subject to the provisions of Exhibit "A".

. . . .

14. *Compensation:* In consideration of the services provided by [Spagnolia] under this Agreement, [DNA] shall compensate [Spagnolia] through the payments of the salary and compensation as set forth in detail on Exhibit "A" which

is attached hereto and incorporated herein by reference.

. . . .

17. *Effect of Termination:* Unless [Spagnolia] agrees otherwise, upon termination of this Agreement for any reason, [DNA] shall pay to [Spagnolia] the actual compensation due under the terms of this Agreement and the attached Exhibit "A" subject to any withholding or deductions as provided for herein, or as may be required by law, if any. Any amounts due to [Spagnolia] shall be calculated by [DNA] and paid to [Spagnolia] as soon as practicable after the Termination Date. The amounts due, if any, to [Spagnolia] upon termination shall be subject to any adjustments provided for by this Agreement, and any such amounts shall be paid within one hundred twenty (120) days of the date of termination of this Agreement.

. . . .

24. *General Provisions:*

. . . .

E. *Entire Agreement.* This Agreement supersedes any other agreements, oral or written, between the parties with respect to the employment of [Spagnolia].

[¶ 4] Exhibit "A," outlining determination and payment of Spagnolia's compensation, provided:

For all services rendered by [Spagnolia] under this Physician Employment Agreement, [DNA] shall pay [Spagnolia] a salary which is based upon the "Net Cash Receipts" of [DNA] received as the result of [Spagnolia's] total production. The actual compensation level for [Spagnolia], during the term of this Agreement, shall be determined under the formula which is authorized, adopted and declared by the Board of Directors of [DNA] from time to time. . . . "Net

Cash Receipts" shall mean the amount of cash which is actually received by [DNA] resulting from patient services performed as provided by [Spagnolia] and resulting from the allowable gross billings generated by [Spagnolia] for such patient services. In determining the "Net Cash Receipts" under this compensation formula, the allowable gross billings of [Spagnolia] shall be reduced by all necessary adjustments, discounts and other reductions in determining the "Net Cash Receipts" by [DNA].... [DNA] herein guarantees that [Spagnolia] shall be entitled to receive Seventy-five Percent (75%) of "Net Cash Receipts," which follow the reduction formula for the administrative expenses set forth above.

In July 1998, Monasky and Spagnolia discussed, but did not execute, a supplemental employment agreement.

[¶ 5]    Monasky began a leave of absence from the practice of neurosurgery on March 15, 1999. Spagnolia's employment with DNA terminated on March 15, 1999, and he began employment with his new corporation, Bismarck Neurosurgical Associates, P.C. ("BNA"), in the same quarters. DNA paid $50,000 to Spagnolia on Spagnolia's last day of employment with DNA.

[¶ 6]    Spagnolia sued DNA and Monasky for additional compensation alleged to be due for medical services provided while he was employed by DNA, but for which payment was not collected until after termination of his employment agreement. Monasky and DNA answered and counterclaimed, seeking dismissal of the complaint, and damages for overpayment of compensation to Spagnolia, for the reasonable value of DNA assets used by Spagnolia and BNA, unjust enrichment, breach of contract, misappropriating trade secrets, and interference with contract.

[¶ 7]    The jury returned a verdict finding DNA owed Spagnolia $98,714.54, and BNA owed DNA $5,000. Judgment was entered in favor of Spagnolia against DNA and Monasky, jointly and severally, for $124,583.90, plus costs and disbursements, and in favor of DNA against BNA for $5,000. The court denied motions by DNA and Monasky to unseal court records of the jury deliberations, for judgment as a matter of law, for a new trial, and to amend the court's findings and judgment.

[¶ 8]    Monasky and DNA appealed the judgment and the court's order allowing costs and fees and denying their post-trial motions.

I

[¶ 9]    Monasky and DNA contend, "because this express contract was clear and unambiguous, and nowhere entitled Spagnolia to the relief he claims, the trial court erred when it refused to enforce the contract as it was written," and erred in allowing the jury to consider parol evidence and construe the contract.

[¶ 10]    "If the intent of the parties can be ascertained from the agreement alone, interpretation of the contract is a question of law." *Garofalo v. Saint Joseph's Hosp.*, 2000 ND 149, ¶ 7, 615 N.W.2d 160. "Whether a contract is ambiguous is a question of law for the court to decide." *Gawryluk v. Poynter*, 2002 ND 205, ¶ 9, 654 N.W.2d 400. "On appeal, we independently review a contract to determine if it is ambiguous." *Id.* "A contract is ambiguous when rational arguments can be made for different interpretations." *Id.* at ¶ 9. "A determination of ambiguity is but the starting point in the search for the parties' ambiguously expressed intentions, which are questions of fact to be determined with the aid of extrinsic evidence." *Bohn v. Johnson*, 371 N.W.2d 781, 788 (N.D.1985). "[I]f the

terms of the contract are ambiguous, extrinsic evidence regarding the parties' intent may be considered, and terms of the contract and parties' intent become questions of fact." *Garofalo*, at ¶ 7. "A contract is interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting" and "may be explained by reference to the circumstances under which it was made and the matter to which it relates. N.D.C.C. § 9–07–12." *Id.* at ¶ 8.

[¶ 11] Spagnolia argues he was entitled to be paid a minimum of 75 percent of the net cash receipts resulting from his patient services. DNA and Monasky argue Spagnolia was not entitled to be paid for receipts collected after the termination of the agreement for medical services performed during the term of the agreement. DNA and Monasky further argue that Spagnolia's assertion he is entitled "to receive all funds, whenever they may be paid to the corporation, less a calculated deduction . . . is flatly contrary to provisions of the contract which require him to be paid 'within 120 days', or final compensation, reconciliation and distribution to be completed at the end of the term of the Agreement." (Record references omitted.) Section 9–07–06, N.D.C.C., provides: "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable. Each clause is to help interpret the others." As this Court noted in *Vanderhoof v. Gravel Products, Inc.*, 404 N.W.2d 485, 491 (N.D. 1987), "[t]he intention of the parties to a contract must be gathered from the entire instrument and not from isolated clauses."

[¶ 12] In its special verdict, the jury found it was "the intention of the parties to the employment contract that DNA pay Spagnolia 'Net Cash Receipts' collected after March 15, 1999." Thus, the jury agreed with Spagnolia's construction of the

parties' agreement. From our review of the contract in light of the parties' arguments, we conclude that the parties have posited rational arguments for different interpretations. We, therefore, conclude the contract is ambiguous, thus creating an issue of fact about the parties' intentions, which the trial court properly submitted to the jury. Further, considering the whole of the contract together, and the circumstances under which it was made, we find no error in the interpretation of the contract.

## II

[¶ 13] DNA and Monasky contend the trial court erred in permitting imposition of an implied trust.

[¶ 14] Sitting in an advisory capacity on Spagnolia's equitable claims, the jury found "DNA and Monasky violate[d] an implied trust with Spagnolia by failing to retain and pay him Net Cash Receipts collected after March 15, 1999." The trial court adopted that finding, "based on" several additional findings the court made, including the following:

A. A confidential relationship of trust and confidence existed between Spagnolia and Monasky.

. . . .

G. DNA and Monasky became implied trustees of the Net Cash Receipts owed to Spagnolia by wrongfully detaining such Net Cash Receipts and then expending such Net Cash Receipts for the sole benefit of Monasky and his wife.

Spagnolia relies on N.D.C.C. §§ 59–01–06 and 59–01–08. N.D.C.C. § 59–01–06 provides in part:

An implied trust arises in the following cases:

1. One who wrongfully detains a thing is an implied trustee thereof for the benefit of the owner.

2. One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless the person has some other and better right thereto, an implied trustee of the thing gained for the benefit of the person who would otherwise have it.

N.D.C.C. § 59–01–08 provides, in part: "Everyone who voluntarily assumes a relation of personal confidence with another is deemed a trustee."

▮▮▮ [¶ 15] "There are two types of implied trusts: resulting and constructive." *Schroeder v. Buchholz*, 2001 ND 36, ¶ 5, 622 N.W.2d 202. "An implied trust, whether resulting or constructive, must be established by clear and convincing evidence." *Id.* A resulting trust is "based on the implied intention of the parties," *McCarney v. Knudsen*, 342 N.W.2d 380, 385 (N.D.1983) (quoting *Manikowske v. Manikowske*, 136 N.W.2d 465, 480 (N.D. 1965)), and "exists where the acts or expressions of the parties indicate an intent that a trust relation resulted from their transaction," *Loberg v. Alford*, 372 N.W.2d 912, 915 (N.D.1985) (quoting *Scheid v. Scheid*, 239 N.W.2d 833, 837 (N.D.1976)). A constructive trust is an equitable remedy to compel a person who unfairly holds a property interest to convey it to the rightful owner. *Schroeder*, at ¶ 5.

▮▮▮ [¶ 16] "A constructive trust has two essential elements: unjust enrichment and a confidential relationship." *Schroeder v. Buchholz*, 2001 ND 36, ¶ 8, 622 N.W.2d 202. "A confidential relationship exists whenever trust and confidence is reposed by one person in the integrity and fidelity of another." *Id.* at ¶ 9 (quoting *Estate of Wenzel–Mosset by Gaukler v. Nickels*, 1998 ND 16, ¶ 25, 575 N.W.2d 425 (N.D.1998) (citations omitted)). "[W]hether a relationship of personal confidence exists need be proven only by a preponderance of the evidence." *Id.* at ¶ 6. "The existence of a confidential relationship and the existence of an implied trust are questions of fact." *Id.* at ¶ 7. "Unjust enrichment is an equitable doctrine, applied in the absence of an express or implied contract, to prevent a person from being unjustly enriched at the expense of another." *Apache Corp. v. MDU Resources Group, Inc.*, 1999 ND 247, ¶ 13, 603 N.W.2d 891 (quoting *Zuger v. North Dakota Ins. Guar. Ass'n*, 494 N.W.2d 135, 138 (N.D.1992)). "The determination of unjust enrichment is a conclusion of law and is fully reviewable on appeal." *BTA Oil Producers v. MDU Resources Group, Inc.*, 2002 ND 55, ¶ 37, 642 N.W.2d 873, *cert. denied*, —— U.S. ——, 123 S.Ct. 436, 154 L.Ed.2d 331 (2002). One of the elements necessary to prove unjust enrichment is the absence of a remedy provided by law. *Schroeder*, at ¶ 15. Parties to a contract have a "remedy at law for enforcement of the contract or damages flowing from any contractual breach." *Id.* at ¶ 18. "[T]here can be no implied-in-law contract" to prevent unjust enrichment "when there is an express contract between the parties relative to the same subject matter." *BTA Oil Producers*, at ¶ 37. "[W]here, as here, the parties have voluntarily entered into an *express written* contract which defines the rights of each, unjust enrichment is a *non sequitur*." *Id.* at ¶ 38 (quoting *JN Exploration & Prod. v. Western Gas Res., Inc.*, 153 F.3d 906, 910 (8th Cir.1998)).

▮▮▮ [¶ 17] Spagnolia employed two Kentucky attorneys to assist him in negotiating the employment agreement with DNA. One of those attorneys testified in a deposition that Spagnolia told him on December 16, 1996, that "Monasky is employer and I am an employee" and that the

contract was "[s]tacked in [Monasky's] favor" and Spagnolia asked the attorney to "go over [the] document with a fine tooth comb." Thus, it is clear Spagnolia was relying on his attorneys to protect his interests in negotiating the contract, not any trust and confidence he reposed in Monasky. We conclude there was no evidence a confidential relationship existed between Spagnolia and Monasky, and the trial court's finding of such a relationship is clearly erroneous. We further conclude there was no confidential relationship between Spagnolia and Monasky as a matter of law.

[¶ 18] DNA did not acquire or detain the revenues flowing from Spagnolia's medical services wrongfully, as DNA owned the revenues under the terms of the parties' employment agreement. Although DNA contracted to pay Spagnolia net cash receipts reduced by administrative expenses, Monasky, as an employee of DNA, has not been shown to have acquired money by fraud, accident, mistake, undue influence, violation of trust, or other wrongful act. There was no confidential relationship between the parties in reaching their agreement, and there was a remedy at law for its breach. We conclude there was no constructive trust. We conclude there was no evidence indicating the parties intended a trust relation, and we conclude there was no resulting trust.

[¶ 19] We conclude the trial court erred in ruling DNA and Monasky were implied trustees of the net cash receipts left after collection of revenues after the termination of the contract and in ordering a judgment against Monasky jointly and severally with DNA.

### III

[¶ 20] DNA and Monasky contend they were denied a fair trial and have asserted fourteen ways in which the trial court erred or abused its discretion in not sequestering witnesses, in admitting or excluding evidence, in denying motions to unseal court records and for a new trial, and in its ruling on interest and costs.

[¶ 21] Without citing to specific references in the trial transcripts, DNA and Monasky assert: "Spagnolia's witnesses were permitted to make numerous references to settlement negotiations conducted by DNA's and Monasky's attorney, Robert Udland, and Spagnolia's then-attorney, Sean O. Smith." This Court is not "obligated to engage in unassisted searches of the record for evidence to support a litigant's position." *Fox v. Fox*, 2001 ND 88, ¶ 22, 626 N.W.2d 660. DNA and Monasky contend Exhibit 25, a calculation of compensation through June 30, 1999, and the last page of Exhibit 26 containing handwritten notes by Monasky about settlement discussions, should have been excluded from evidence by N.D.R.Ev. 408. We need not determine if admission of those items was error, however, as DNA and Monasky have not attempted to demonstrate that admission of the exhibits was prejudicial. "An appealing party has the burden 'of establishing not only that the trial court erred but that such error was highly prejudicial to his cause.'" *Olander Contracting Co. v. Gail Wachter Investments*, 2002 ND 65, ¶ 26, 643 N.W.2d 29 (quoting *Filloon v. Stenseth*, 498 N.W.2d 353, 356 (N.D.1993)).

[¶ 22] We have examined the other issues raised by DNA and Monasky and conclude they have not demonstrated the trial court committed any reversible errors of law or abused its discretion.

### IV

[¶ 23] The judgment in favor of Spagnolia and against DNA is affirmed. The portion of the judgment holding Monasky

jointly and severally liable with DNA is reversed. The judgment in favor of DNA and against BNA is affirmed.

[¶ 24]DALE V. SANDSTROM, CAROL RONNING KAPSNER, JJ., KIRK SMITH, S.J., and DONOVAN J. FOUGHTY, D.J., concur.

[¶ 25] The Honorable DONOVAN JOHN FOUGHTY, D.J., and the

Honorable KIRK SMITH, S.J., sitting in place of VANDEWALLE, C.J., and MARING, J., disqualified.