1999 ND 120

**FARGO FOODS, INC.,** an Oregon Corporation, and Portland Food Products Company, an Oregon Corporation, Plaintiffs, Appellants and Cross–Appellees

v.

**Jack BERNABUCCI,** Scott Fridlund, Don Russell, Cloverdale Foods, Inc., a North Dakota Corporation, and Dimension Marketing, Inc., a North Dakota Corporation, Defendants, Appellees and Cross–Appellants

No. 980283.

Supreme Court of North Dakota.

June 25, 1999.

David S. Maring (argued), Maring Williams Law Office, Bismarck, and Jeffrey J. Keyes and James J. Long (on brief), Briggs & Morgan, Minneapolis, MN, for plaintiffs, appellants and cross-appellees.

Jon J. Jensen, Pearson, Christensen, Clapp, Fiedler, Fischer & Jensen, Grand Forks, for defendants, appellees and cross-appellants.

VANDE WALLE, Chief Justice.

[¶ 1] Fargo Foods, Inc., (formerly known as American Specialty Foods),[1] and its parent company, Portland Food Products Company, (collectively referred to as sellers) appealed from a judgment dismissing with prejudice their complaint against Jack Bernabucci, Scott Fridlund, Don Russell, Cloverdale Foods, Inc., and Dimension Marketing, Inc. (collectively referred to as purchasers). The purchasers cross-appealed from the dismissal with prejudice of their counterclaim against the sellers. We affirm.

I

[¶ 2] American Specialty Foods operated a large food processing facility in Fargo. Dimension Marketing is a North Dakota corporation, and Fridlund is its sole shareholder and officer. Cloverdale Foods is a large meat processing and distribution company. Russell is the chairman and CEO of Cloverdale. Bernabucci is a director of Cloverdale.

[¶ 3] In 1993, the purchasers and sellers began negotiations for the sale of American Specialty Foods, which had been experiencing financial difficulties. On July 29, 1994, after several offers and counteroffers, the sellers and purchasers entered into an "assets purchase agreement" which designated Dimension Marketing as the "purchaser," and Cloverdale and Russell as "joint obligors." Russell and Fridlund

1. Fargo Foods is the current corporate name of the entity previously known as American Specialty Foods, which was a wholly-owned subsidiary of Portland Food Products. We refer to Fargo Foods and American Specialty Foods interchangeably throughout this opinion.

signed the agreement on behalf of Dimension Marketing, and Russell and Bernabucci signed on behalf of Cloverdale. Dimension Marketing agreed to purchase American Specialty Foods' business assets, including land, buildings, related equipment, inventory, and accounts receivable. Dimension Marketing also agreed to assume American Specialty Foods' obligations to suppliers and vendors. The parties agreed to a $8,750,000 purchase price, with $5,000,000 in cash due at closing, $3,000,000 secured by a real estate mortgage, and $750,000 payable in quarterly installments over five years.

[¶ 4] The agreement outlined several representations and warranties by the sellers, including there had been no adverse and material changes in American Specialty Foods' operations since March 31, 1994. The sellers agreed to refrain from engaging in any transaction outside the ordinary course of American Specialty Foods' business and to use best efforts to preserve existing business relations with its suppliers.

[¶ 5] The agreement set an August 22, 1994 closing date for the transaction and provided:

10.1 *Termination.* This Agreement may be terminated after execution and before the Closing Date only on one of the following grounds:

(a) by mutual written consent of Purchaser and Seller; or

(b) after written notice by either party, which notice must provide the other party reasonable opportunity to cure, if there has in fact been a material misrepresentation in the warranties or representations given by the other party under this Agreement.

In the event of termination by any party as above provided, prompt written notice shall be given to the other party.

[¶ 6] At a meeting on Monday, August 22, 1994, the purchasers refused to close the sale, and they orally indicated the sellers had breached the agreement. According to Russell, the purchasers were unwilling to close the transaction unless the sellers agreed to satisfy trade creditors the purchasers claimed had not been paid in the previous two weeks and to return money the purchasers claimed had been diverted from American Specialty Foods. On August 23, 1994, the parties had another meeting and Russell read a statement indicating the sellers had breached the agreement.

[¶ 7] On August 24, 1994, counsel for the purchasers sent the sellers a letter stating:

Pursuant to paragraph 10.1(b) of the Asset Purchase Agreement, DMI hereby gives notice of termination of the contract arising from material misrepresentations given by the Seller in the Agreement. DMI believes that material breaches have occurred that include but may not be limited to Section 5.6(a)(e)(*l*)(n), Section 7.2(a) and (d) and Section 8.2.

DMI believes that in the two week period prior to closing, payments to trade creditors were discontinued, thus requiring a greater equity contribution to sustain the business than required at the time of July 29, 1994, Agreement. In addition, DMI believes that $1.8 million dollars, more or less, was diverted to Portland Food Products Company entities and affiliates in blatant disregard of the Purchaser's rights, created under the Asset Purchase Agreement.

DMI's financing commitments remain in place and DMI continues to be ready and able to perform its obligations for payment and the Seller is hereby given an opportunity to cure the default by depositing into the account of ASF, for payment to trade creditors all sums withdrawn or not deposited in ASF account in the ordinary course of business, in the estimated amount of $1.8 million dollars, more or less. Please advise whether the Seller will cure the defaults stated above in a timely manner. If a

timely cure is not undertaken, which DMI believes should be no later than 9:00 a.m. Friday, August 26, 1994, DMI will consider the Agreement breached by the Seller and terminated.

On August 24, 1994, counsel for the purchasers sent the sellers another letter stating:

After further review of the conduct of the Seller, in the two week period prior to closing, DMI believes that the Seller has also violated Section 5.6(g) and (m) and Section 7.2(b) and (e).

DMI believes that discontinuing payments to trade creditors was not in the ordinary course of business considering that historically collected account receivables have been applied to trade payables. It appears the funds collected were paid out to PFP or its affiliates and said conduct is detrimental to trade payable vendors. The actions are contrary to customary past practices of the Seller and are outside the ordinary course of business.

The effect of the Seller's action was to severely reduce and impair the working capital necessary to preserve and maintain the business.

[¶ 8] The sellers took no action to cure by August 26 and in September the sellers sold American Specialty Foods to another buyer for $5,250,000, and the company's name was changed to Fargo Foods.

[¶ 9] The sellers sued the purchasers for breach of contract and fraud, and the purchasers counterclaimed for breach of contract and fraud. After a bench trial, the trial court dismissed with prejudice the sellers' complaint, ruling (1) the assets purchase agreement was a binding contract, but the sellers breached material provisions of the agreement and did not cure their breach; and (2) the sellers' allegation of fraud was not supported by clear and convincing evidence. The court also dismissed with prejudice the purchasers' counterclaim, finding it was not supported by the evidence. The sellers appealed, and the purchasers cross-appealed.

## II

[¶ 10] We review the trial court's findings of fact under the "clearly erroneous" standard of N.D.R.Civ.P. 52(a). A finding of fact is clearly erroneous if it is induced by an erroneous conception of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire record, a reviewing court is left with a definite and firm conviction a mistake has been made. *Schmitz v. Schmitz*, 1998 ND 203, ¶ 5, 586 N.W.2d 490. A trial court's conclusions of law are fully reviewable. *Edwards v. Edwards*, 1997 ND 94, ¶ 4, 563 N.W.2d 394.

## III

[¶ 11] The sellers argue the purchasers breached the agreement by failing to comply with the termination provision. The sellers argue the purchasers failed to give timely written notice of the alleged material misrepresentations prior to their refusal to close. The sellers also argue the purchasers' purported notice of termination sought cure of actions that were not a breach of the agreement.

[¶ 12] A provision in a contract allowing termination of the contract under certain conditions will be enforced if the party seeking termination complies with the conditions of the termination provision. *See Ray Co., Inc. v. Johnson*, 325 N.W.2d 250, 252 (N.D.1982); *McWithy v. Heart River Sch. Dist.*, 75 N.D. 744, 749, 32 N.W.2d 886, 889 (1948). A contract cannot be arbitrarily terminated under a provision authorizing termination. *McWithy*, 75 N.D. at 749, 32 N.W.2d at 889. Other courts also recognize a party seeking to terminate a contract under a termination provision must comply with the requirements of the termination clause. *See Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 727 (2nd Cir.1992); *Filmline (Cross–Country) Prod. v. United Artists*, 865 F.2d 513, 518–19 (2nd Cir.1989); *Tomsheck v. Doran*, 126 Mont. 598, 256 P.2d 538, 543

(1953). *See generally* 17A Am.Jur.2d Contracts § 559 (1991).

[¶13] Our analysis of the termination issue starts with the interpretation of the termination clause. *See Ray,* 325 N.W.2d at 252–53. The construction of a written contract to determine its legal effect is a question of law. *Pamida, Inc. v. Meide,* 526 N.W.2d 487, 490 (N.D.1995). We construe contracts to give effect to the parties' mutual intention at the time of contracting. N.D.C.C. § 9–07–03; *Pamida,* at 490. The parties' intention must be ascertained from the writing alone, if possible. N.D.C.C. § 9–07–04; *Pamida,* at 490. We interpret contracts as a whole to give effect to each part if reasonably practicable. N.D.C.C. § 9–07–06. Words of a contract are understood in their ordinary and popular sense. N.D.C.C. § 9–07–09.

[¶14] The purchase agreement authorizes termination "after execution and before the Closing Date only on one of the following grounds ... (b) after written notice by either party, which notice must provide the other party reasonable opportunity to cure, if there has in fact been a material misrepresentation in warranties or representations given by the other party under this Agreement. In the event of termination by any party as above provided, prompt written notice shall be given to the other party."

[¶ 15] When construed as a whole to give effect to each part of the purchase agreement, we believe the plain language of the termination clause authorizes termination for material misrepresentations in warranties or representations discovered between the date of execution and the closing date. Under the plain language of the agreement, a party seeking termination must give "prompt written notice" which "must provide the other party reasonable opportunity to cure," and the other party must fail to cure. The termination is effective after prompt written notice and the other party's failure to cure. We decline to construe the termination clause to require written notice, with an opportunity to cure, prior to closing or the refusal to close, because that interpretation ignores the plain language requiring "prompt written notice." We construe the termination clause to require prompt written notice after an alleged material misrepresentation in warranties or representations is discovered. We believe that interpretation effectuates the parties' intent to permit termination of the agreement for material misrepresentations while recognizing those misrepresentations may not be discovered until the eve of closing.

[¶ 16] The trial court found:

13. After July 28, 1994, substantial sums of money were diverted from ASF operations to Portland Products. General Nutrition, one of ASF's largest accounts, terminated their contract and paid off inventory. The [Purchasers] knew and understood that the General Nutrition contract proceeds were not part of the July 28 agreement, but it is also apparent that the [Purchasers] did not anticipate or realize the impact the hasty departure of millions of dollars would have on the vitality of ASF as a "going concern."

14. The closing date specified in the purchase agreement was Monday, August 22, 1994. The creditors of ASF were as a rule paid on Fridays. On the Friday before the closing, ASF made a corporate decision not to pay creditors who had been previously promised payment. Approximately $300,000 was withheld during the week of August 15. Even though it may have been a "wash" relative to sale, immediate working capital needs at the time of closing were affected.

15. The Court finds that the payment of vendors in a timely fashion was critical to the preservation of ASF's business....

....

19. The closing did not take place on August 22 due to [Purchasers'] refusals to perform. The [Purchasers] claimed

breach of contract on the part of [Sellers] in two respects: failure to pay vendors in the ordinary course of business, and the removal of cash from the business. Jay Carlson, attorney for [Purchasers], sent a letter on August 24 outlining the specific terms of breach and demanding the return of $1.8 million in cash which had been taken out of ASF shortly before closing and the payment of vendors.

. . . .

2. [Sellers], however, by their conduct prior to closing, breached material provisions of said agreement which relieved the [Purchasers] of their duty to perform under said contract, specifically, paragraph 5.6(a), 5.6(m), 5.6(n), 5.8, 7.2(b), and 7.2(d) of the July 29, 1994, agreement. The [Sellers] did not cure the breach.

[¶ 17] Although the trial court did not specifically state the purchasers complied with the termination clause, the court found the purchasers' counsel sent the sellers an August 24, 1994 letter outlining the purchasers' claims of breach and providing the sellers an opportunity to cure by paying vendors and returning money which Portland Food Products had taken out of American Specialty Foods before the closing date. The court found the sellers' conduct prior to closing breached material representations, warranties, and covenants, including warranties to not make adverse changes in the sellers' operations, to not engage in transactions outside the ordinary course of business, and to use best efforts to preserve the existing business organization and relations with suppliers. A trial court is in a better position to decide factual issues than this Court. *Krizan v. Krizan*, 1998 ND 186, ¶ 9, 585 N.W.2d 576. There is evidence to support the trial court's findings and we decline to retry any factual issues regarding the sellers' breach of the agreement. The court's reference to provisions of the agreement which it found were breached corresponds to the provisions cited by the purchasers'

counsel in the August 24, 1994 letters. The breaches found by the trial court were within the scope of the opportunity to cure provided in the August 24, 1994 letter, and we reject the sellers' claim the purchasers' written notice demanded cure of actions that were not breaches of the agreement. The court's findings are sufficient for us to understand it found the purchasers complied with the requirements of the termination clause, including providing prompt written notice, and the sellers did not cure the breaches. *See Throndset v. L.L.S.*, 485 N.W.2d 775, 777 n. 2 (N.D.1992) (stating trial court's findings must be sufficient to enable appellate court to understand reasoning behind trial court's decision). We are not left with a definite and firm conviction the trial court's findings are mistaken. We therefore affirm the court's decision the sellers breached the purchase agreement and did not cure the breaches.

## IV

[¶ 18] The sellers argue the trial court erred in deciding their fraud claim was not supported by clear and convincing evidence. They claim the purchasers made many misrepresentations during the course of the negotiations as part of a fraudulent scheme to purchase American Specialty Foods at the last minute for a drastically reduced price.

[¶ 19] Fraud must be proven by clear and convincing evidence. *E.g. Kary v. Prudential Ins. Co.*, 541 N.W.2d 703, 705 (N.D.1996). Fraud is a question of fact, subject to the clearly erroneous standard. *E.g. Sargent Cty. Bank v. Wentworth*, 500 N.W.2d 862, 874 (N.D. 1993). There was conflicting evidence and conflicting inferences to be drawn regarding the parties' negotiations for a financially troubled business. The trial court was in a better position than this Court to evaluate the factual evidence. *See Krizan*, 1998 ND 186, ¶ 9, 585 N.W.2d 576. The court found the purchasers were dealing in good faith in attempting to purchase a debt-ridden company and there was no

evidence of actual or tacit fraud. We are not left with a definite and firm conviction the court made a mistake in finding there was not clear and convincing evidence the purchasers committed fraud. The court's finding is not clearly erroneous.

## V

[¶ 20] In their cross-appeal, the purchasers argue they presented sufficient evidence to recover damages for the sellers' breach of contract. Relying on the sellers' estimated value of $11,000,000 for the assets of American Specialty Foods, the purchasers argue they would have received $11,000,000 in assets for $8,750,000 if the sellers had not breached the agreement. The purchasers thus argue they were entitled to recover $2,250,000 in damages. The trial court found the purchasers presented no evidence to support their counterclaim for damages. The court, in essence, found the sellers' estimated value

of the company was not credible. We are not left with a definite and firm conviction the court made a mistake. The court's finding is not clearly erroneous

## VI

[¶ 21] The judgment is affirmed.

[¶ 22] SANDSTROM, NEUMANN, KAPSNER, JJ., and JAMES H. O'KEEFE, S.J., concur.

[¶ 23] JAMES H. O'KEEFE, S.J., sitting in place of MARING, J., disqualified.