2015 ND 238

**BORDER RESOURCES, LLC,**
**Plaintiff and Appellee**

v.

**IRISH OIL & GAS, INC., and Twin City Technical, LLC, Defendants and Appellants.**

No. 20140264.

Supreme Court of North Dakota.

Sept. 21, 2015.

W. Todd Haggart (argued) and Neil J. Roesler (on brief), Fargo, N.D., for plaintiff and appellee.

Jon T. Dyre (argued), Paul J. Forster (appeared) and John W. Morrison Jr. (on brief), Bismarck, N.D., for defendants and appellants.

McEVERS, Justice.

[¶ 1] Irish Oil & Gas, Inc., and Twin City Technical, LLC, (collectively "Irish Oil") appeal from a judgment entered after a bench trial, awarding Border Resources, LLC ("Border"), damages and prejudgment interest and dismissing Irish Oil's counterclaim for breach of fiduciary duty. We conclude the district court did not clearly err in finding Border did not breach its fiduciary duty while providing professional landman services to Irish Oil and in finding leases Border acquired for Irish Oil were sold for $1,100 per net mineral acre. We further conclude the court did not abuse its discretion in denying Irish Oil's motion to amend its counterclaim to add individual landmen as counterclaim defendants. We affirm.

I

[¶ 2] Irish Oil is an oil and gas exploration, production, and brokerage company. Border provides landman services to clients, including acquiring leases, performing due diligence, and providing title curative work. This case involves Border's claim against Irish Oil for breach of contract for landman services Border provided to Irish Oil and Irish Oil's counterclaim against Border for breach of fiduciary duty in performing those services.

[¶ 3] On January 24, 2011, Irish Oil and Border contracted for Border to acquire oil and gas leases for Irish Oil in a designated prospect area ("IRS–TP prospect").

Tim Furlong, an officer of Irish Oil, and Jeff Skaare, an officer of Border, established the contract's basic terms in a series of emails sent between January 24 and 25, 2011, and a prospect map Furlong emailed to Skaare on January 25, 2011. Under the contract, Irish Oil agreed to pay Border 25 percent of the profit from the sale of oil and gas leases that Border acquired for Irish Oil in the prospect area, plus 25 percent of any retained overriding royalty interests. Border agreed to perform due diligence and title curative work on the leases Border acquired for Irish Oil, and Irish Oil agreed to pay 100 percent of the bonuses to mineral lessors to acquire the leases. Twin City was a 50 percent investor with Irish Oil in the IRS–TP prospect and was responsible for paying one-half of the bonus payments and one-half of the money owed to Border under the contract.

[¶ 4] Irish Oil authorized Border to purchase leases in Irish Oil's name within the "purchase" area delineated on the prospect map Furlong provided to Skaare. Within the "purchase" area, Border was authorized to pay up to $500 per net mineral acre for a five-year lease term and to pay a one-sixth royalty. Border was given additional authority to enter into shorter lease terms under other conditions expressed in emails confirming the contract. The contract initially authorized acquisition of 3,500 to 4,000 net mineral acres, and Irish Oil later increased the acreage to 4,500 net mineral acres.

[¶ 5] Border's authority to acquire oil and gas leases for Irish Oil in the IRS–TP prospect was non-exclusive in favor of Irish Oil, in that Irish Oil had the right to acquire oil and gas leases in the same prospect through others without sharing the profits with Border. The parties' contract required Border to perform distinct functions:

A. Acquire oil and gas leases in Irish's name within the "purchase" area delineated on Furlong's map within the parameters established by Furlong;

B. Submit for Irish's review oil and gas acreage within the "review" area outside the "purchase" area on the Furlong map . . .; and

C. Complete "due diligence," including title curative work, on leases acquired by Border for Irish in the IRS–TP prospect.

Border carried out the work required under the contract through its employees and its contract landmen and continued acquiring leases for Irish Oil into March 2011.

[¶ 6] On March 22, 2011, Furlong sent an email to Skaare stating:

Appreciate the update yesterday. *Please cut off all negotiations as of Thursday March 24th.* I would like to have all the hard schedule of exactly what we have in hand on Friday afternoon March 25th. I think we can close on this by April 15th.

Also please keep in mind that anything North of 139 and east of 100 and west of 96 we can pay more money for and a quick sale.

(Emphasis added.) Border did not acquire any additional leases for Irish Oil after March 24, but continued to perform its contract obligations to provide due diligence and title curative work on the leases Border had acquired for Irish Oil.

[¶ 7] On March 21, 2011, Toby Zastoupil, a landman for Border, was asked by an individual to acquire mineral leases in Slope County, which were between four and six miles outside of the IRS–TP prospect. On March 29, 2011, Zastoupil spoke with Harvey Wolski about the Slope County leases. On April 15, 2011, Zastoupil and Wolski again spoke regarding the potential

Slope County leases, and Zastoupil also learned about the availability of oil and gas lease acreage that the Wolski family owned in Billings County ("Wolski leases"). These Wolski leases were outside the "purchase" area but within the "review" area delineated on the IRS–TP prospect map. Border subsequently acquired the Wolski leases for itself and Interwest Petroleum between April 26 and May 11, 2011.

[¶ 8] In an April 6, 2011, email exchange between Skaare and Furlong, Skaare stated Border was not purchasing any additional leases for Irish Oil, and Furlong advised Skaare that Irish Oil had committed the IRS–TP acreage to a purchase and sale agreement. In an April 11, 2011, email, Furlong asked Skaare for an estimate on when Border could complete the due diligence and documentation so Irish Oil could close on the sale on its IRS–TP prospect. Although Irish Oil did not close on the sale of the IRS–TP leases on April 15, 2011, Irish Oil subsequently agreed to sell the IRS–TP leases as a part of a larger sale of oil and gas leases to Chesapeake Exploration, LLC.

[¶ 9] On June 24, 2011, Irish Oil reached an agreement to sell to Chesapeake a group of oil and gas leases, containing the IRS–TP leases at issue and separate acreage leased from the Evangelical Lutheran Church in America ("ELCA") for $1,100 per net mineral acre. Irish Oil sold to Chesapeake at this price a total of 4131.9 net mineral acres that had been acquired under the contract with Border for a total of $4,545,090. Irish Oil received final payment from Chesapeake in August 2011. About two weeks later, Furlong informed Skaare of the sale of the IRS–TP lease acreage and reported the sale price was $825 per net mineral acre.

[¶ 10] On August 16, 2011, Irish Oil paid Border a total of $339,600 based on a sale price of $825 per net mineral acre. Irish Oil still owed Border approximately $45,500 under the reported price. After Border's receipt of the partial payment, Skaare periodically requested Furlong to pay Border the remaining balance. In an October 2011, email, Furlong raised an issue with Border about the Wolski leases:

We do have an issue that we will have to address which is the lease that you bought in 137–100. The mineral owners actually called me and said Toby [Zastoupil] was dealing with them and I backed off thinking it was for Irish since [it] was in our prospect.

[¶ 11] In December 2011, Border continued to seek a final accounting and payment from Irish Oil. Border contacted Chesapeake and learned that the IRS–TP leases had been combined with the ELCA leases and the "blended" price of the lease package was $1,100 per net mineral acre. Border demanded to be paid the percentage of profits on the IRS–TP leases based on the $1,100 contract price and the acquisition costs of the IRS–TP leases. Irish Oil refused.

[¶ 12] Border sued Irish Oil for breach of contract, alleging Irish Oil had failed to pay the contractual price for the leases and sought approximately $330,000 in additional compensation. Irish Oil denied liability and counterclaimed for breach of fiduciary duty for Border's actions regarding the Wolski leases.

[¶ 13] After a February 2014 bench trial, the district court ruled in favor of Border on its contract claim and dismissed Irish Oil's counterclaim. The court found that Irish Oil agreed to pay Border 25 percent of the profit from the sale of the IRS–TP leases acquired by Border and that Irish Oil sold those leases to Chesapeake for $1,100 per net mineral acre. Although Irish Oil had claimed the IRS–TP acreage was worth less than the ELCA

acreage sold to Chesapeake as part of the sale, the district court found Irish Oil had not presented evidence the sale price for the IRS–TP acreage was anything other than $1,100 per net mineral acre. An amended judgment awarded Border $390,578.12, including prejudgment interest and costs, and dismissed Irish Oil's counterclaim with prejudice.

## II

[¶ 14] This Court's standard of review on appeal from a bench trial is well-established:

> In an appeal from a bench trial, the trial court's findings of fact are reviewed under the clearly erroneous standard of N.D.R.Civ.P. 52(a) and its conclusions of law are fully reviewable. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all the evidence, we are left with a definite and firm conviction a mistake has been made. In a bench trial, the trial court is the determiner of credibility issues and we do not second-guess the trial court on its credibility determinations.

*Brash v. Gulleson*, 2013 ND 156, ¶ 7, 835 N.W.2d 798 (quotation marks and citations omitted). A district court's findings are "presumptively correct." *Tweeten v. Miller*, 477 N.W.2d 822, 824 (N.D.1991). A "court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the trial court." *Erickson v. Olsen*, 2014 ND 66, ¶ 19, 844 N.W.2d 585.

[¶ 15] Generally, the interpretation of a contract presents a question of law on appeal, but whether a party has breached a contract is a finding of fact reviewed under N.D.R.Civ.P. 52(a).

*WFND, LLC v. Fargo Marc, LLC*, 2007 ND 67, ¶ 13, 730 N.W.2d 841. We construe contracts to give effect to the parties' mutual intent at the time the contract was formed, and if possible, we look to the writing alone to determine the parties' intent. *Fargo Foods, Inc. v. Bernabucci*, 1999 ND 120, ¶ 13, 596 N.W.2d 38. When the parties' intent can be determined from the contract language alone, interpretation of a contract presents a question of law. *VND, LLC v. Leevers Foods, Inc.*, 2003 ND 198, ¶ 34, 672 N.W.2d 445. However, when a contract is ambiguous, extrinsic evidence may be considered to determine the parties' intent, and the contract terms and the parties' intent become questions of fact. *Spagnolia v. Monasky*, 2003 ND 65, ¶ 10, 660 N.W.2d 223.

## III

[¶ 16] Irish Oil argues the district court erred in concluding Border did not owe Irish Oil a fiduciary duty while providing professional landman services and breached that duty when Border acquired the Wolski leases.

[¶ 17] Generally, an agency relationship results when a principal authorizes an agent to act on the principal's behalf in dealing with third parties. *See* N.D.C.C. § 3–01–01; *Auction Effertz, Ltd. v. Schecher*, 2000 ND 109, ¶ 9, 611 N.W.2d 173. Courts have held that a fiduciary duty, including a corresponding duty of loyalty and honesty, arises between an oil company and its landman based on the existence of a confidential relationship. *See Tenneco Oil Co. v. Joiner*, 696 F.2d 768, 775–76 (10th Cir.1982); *Chisholm v. Western Reserves Oil Co.*, 655 F.2d 94, 96 (6th Cir.1981); *Harding Co. v. Sendero Res. Inc.*, 365 S.W.3d 732, 741–42 (Tex.Ct. App.2012); 4 Nancy Saint–Paul, ed., *Summers Oil and Gas* § 57:6 (3d ed.2009). "The *existence and scope* of a fiduciary

duty depends upon the language of the parties' agreement." *Grynberg v. Dome Petroleum Corp.*, 1999 ND 167, ¶ 21, 599 N.W.2d 261 (emphasis added); *see also Knudson v. Kyllo*, 2012 ND 155, ¶ 27, 819 N.W.2d 511; *Sandvick v. LaCrosse*, 2008 ND 77, ¶ 14, 747 N.W.2d 519.

[¶ 18] As we explained in *Burlington N. & Santa Fe Ry. Co. v. Burlington Res. Oil & Gas Co.*, 1999 ND 39, ¶ 17, 590 N.W.2d 433, "[a] business agency represents a fiduciary relationship which allows the trusting party, the principal, to relax the care and vigilance ordinarily exercised." "In a fiduciary relationship, an agent is generally under a duty to act for, or to give advice to, a principal upon matters *within the scope of the relationship*," and "[t]he prohibition against self dealing lies at the heart of the fiduciary relationship." *Id.* (emphasis added). Nonetheless, "[a]gency law generally recognizes a principal's authorization to an agent and the agent's duties to the principal are determined by the parties' agreement and the nature of the fiduciary relationship." *Id.* at ¶ 21. While the existence and scope of a fiduciary duty depends on the parties' agreement, whether a person has breached a fiduciary duty presents a question of fact, subject to the clearly erroneous standard of review. *Red River Wings, Inc., v. Hoot, Inc.*, 2008 ND 117, ¶ 28, 751 N.W.2d 206; *Akerlind v. Buck*, 2003 ND 169, ¶¶ 26–27, 671 N.W.2d 256.

[¶ 19] Irish Oil argues Border admitted at trial it owed Irish Oil a fiduciary duty when it took the Wolski leases, but the district court erroneously found no fiduciary duty existed. Irish Oil argues the finding of no fiduciary duty is contrary to Border's admissions at trial, is unsupported by the law, and therefore is clearly erroneous. Irish Oil asserts the parties intended Border would owe Irish Oil a fiduciary duty when performing due dili-

gence under the contract. Irish Oil also argues the ethical standards and standards of conduct of the American Association of Professional Landmen ("AAPL") established that Border and its professional landmen owed a duty of good faith and loyalty to Irish Oil and were prohibited from acting adversely or engaging in conflict with its interests. Irish Oil argues Border admitted the AAPL standards governed its conduct, and the court erred in ignoring this testimony.

[¶ 20] Irish Oil argues that, even without Border's admissions at trial, Border owed Irish Oil a fiduciary duty as a matter of law as landmen and Irish Oil's agents. Irish Oil asserts Border was hired to provide professional landman services, which constitutes an agency relationship. Because David Kenjalo, Skaare, and Zastoupil fulfilled Border's contract obligations to provide professional landman services to Irish Oil, Irish Oil contends they were Irish Oil's subagents and lawfully appointed subagents represent the principal in like manner with the original agent. *See* N.D.C.C. §§ 3–02–13, 3–02–14. Irish Oil asserts Kenjalo, Skaare, and Zastoupil, as subagents, therefore also owed a fiduciary duty to Irish Oil. Irish Oil also argues that the district court erred in finding Furlong's March 22, 2011, email terminated the agency relationship on March 24, 2011, and contends the agency or subagency relationship continued until the contract's due diligence obligation was completed. Irish Oil asserts Border completed its due diligence on April 28, 2011. Based on the continuing existence of a fiduciary duty, Irish Oil argues Border breached the fiduciary duty when Border acquired the Wolski leases, and asserts ample evidence establishes damages by Border's breach.

[¶ 21] Border responds its agency relationship with Irish Oil ended on March 24, 2011, and Border's obligation under its

contract with Irish Oil to submit leases for review had been fully performed before Border entered negotiations for the Wolski leases on April 18, 2011. Border contends that when it learned of the Wolski leases availability on April 15, 2011, it was justified in not submitting those leases to Irish Oil for review because it no longer owed any fiduciary duty to Irish Oil after the agency relationship terminated on March 24, 2011.

[¶ 22] The district court made extensive findings of fact that Border and its landmen did not breach a fiduciary duty to Irish Oil by acquiring the Wolski leases. The court found that Border no longer had the power to act on Irish Oil's behalf as its agent in acquiring leases in Irish Oil's name after March 24, 2011; that Skaare reasonably believed Irish Oil intended to close on the sale of the IRS–TP prospect by April 15, 2011; that Border did not acquire any additional oil and gas leases for Irish Oil in the IRS–TP prospect after March 24, 2011, nor was it requested or authorized to do so; and that, based on the termination of Border's authority to acquire leases on March 24, 2011, and the anticipated sale of the leases by April 15, 2011, Border had no contractual obligation after March 24, 2011, to submit oil and gas leases within the designated "review" area on the map.

[¶ 23] The district court found that Border, through Zastoupil, first learned of the availability of the Wolski acreage on April 15, 2011; that Border had acquired the Wolski leases in its own name from about April 26, 2011, through May 11, 2011; and that, Border did not learn of the Wolski leases' availability through any work performed for Irish Oil or based on any information obtained as a result of Border's work for Irish Oil. The court found that Irish Oil knew Border was dealing with Wolski regarding the Wolski leas-

es; that Furlong knew or should have known Border was not negotiating purchases on Irish Oil's behalf because Furlong knew Border no longer had authority to purchase leases for Irish Oil; and that Furlong did not raise any issue of an alleged breach of fiduciary duty until October 2011, after Border had asserted its claim for payment.

[¶ 24] The district court further explained:

> The record reflects that Border did not acquire any more leases for Irish after March 24, 2011 and reflects that Border was never requested to do so. The record does reflect that Border continued its contractual obligations to provide curative work and due diligence on the titles for the leases it had acquired on Irish's behalf. As such, this Court finds that the agency relationship, whereby Border was authorized by Irish to acquire leases on behalf of Irish by negotiating with mineral rights owners in the area within the green border and whereby Border was required to present leads to possible leases in the review area, ended as of March 24, 2011. After that date Border no longer had the authority to act on behalf of Irish because lease acquisition and the necessary negotiations to acquire leases w[as] halted by Furlong's email. Any curative work or due diligence left to complete on the already-acquired leases was merely a contractual agreement whereby Border worked for Irish as opposed to working on behalf of Irish as its agent. *Because it was the agency relationship that conferred the fiduciary duties on the parties, not the contract; and since the agency relationship was terminated on March 24, 2011, Border did not owe a fiduciary duty to Defendants at the time Border dealt with the [Wolski] leases in April 2011.* Furthermore, based upon:

a. Furlong's direction that Border cut off all negotiations as of Thursday March 24th;

b. his request for a hard schedule of exactly what leases they had by March 25th;

c. his statement indicating an expectation that they would close by April 15th; and

d. his failure to subsequently advise otherwise;

the Court finds that Border's obligation under that portion of the contract addressing submission of leases for review had been fully performed prior to that point in time when Border entered into negotiations for what became the [Wolski] lease[s]. . . . Still further, the Court finds that Border was justified in reaching that conclusion.

(Emphasis added.)

[¶ 25] Although the district court broadly held that Border did not owe Irish Oil a fiduciary duty when Border acquired the Wolski leases, we understand the court's analysis as attempting to define the scope, rather than the existence, of the fiduciary duty that Border owed to Irish Oil under the contract. *See Grynberg,* 1999 ND 167, ¶ 21, 599 N.W.2d 261 ( "existence and scope of a fiduciary duty depends upon the language of the parties' agreement"); *see also* N.D.C.C. § 3–02–04 ("When an authority is given partly in general and partly in specific terms, the general authority gives no higher powers than those specifically mentioned."); *Crestwood Farm Bloodstock v. Everest Stables, Inc.,* 751 F.3d 434, 443 (6th Cir. 2014) ("Where a contract exists defining the scope of the principal-agent relationship ... the existence and extent of the agent's duties are determined by the agreement between the parties.") (citing *Monumental Life Ins. Co. v. Nationwide Retirement Solutions, Inc.,* 242 F.Supp.2d 438, 449 (W.D.Ky.2003) ("An agent is a fiduciary with respect to matters within the scope of his agency."); Restatement (Second) of Agency § 376); *Palm Bay Intern., Inc. v. Marchesi Di Barolo S.P.A.,* 796 F.Supp.2d 396, 416 (E.D.N.Y.2011) ("It is well-established that agents owe their principals a duty to exercise the utmost good faith and loyalty. However, an agent owes a fiduciary duty 'only with respect to matters within the scope of his agency.' " (citations omitted)); Restatement (Third) of Agency § 8.01 ("Fiduciary obligation, although a general concept, is not monolithic in its operation. In particular, an agent's fiduciary duties to the principal vary depending on the parties' agreement and the scope of the parties' relationship [and] examining whether particular interactions are as principal and agent.").

[¶ 26] The district court found that under the contract, Border was to perform at least three distinct functions on Irish Oil's behalf, including acquiring oil and gas leases within the "purchase" area, submitting for review acreage within the "review" area outside the "purchase" area, and completing "due diligence" and title curative work on the leases acquired for Irish Oil. Irish Oil acknowledges the written contract between Irish Oil and Border is silent on the question of a fiduciary duty and that silence left the district court to fill in the gaps based on the parties' mutual intentions under the contract.

[¶ 27] In defining the existence and scope of the fiduciary duty Border owed to Irish Oil, the district court primarily analyzed and made findings as to the scope of the agency relationship, in which Irish Oil granted Border the authority to acquire leases on Irish Oil's behalf. Furlong's March 22, 2011, email to Skaare specifically instructed Border to "cut off all negotiations" as of March 24th. The court found that Irish Oil terminated Border's authori-

ty to acquire leases on Irish Oil's behalf on March 24, 2011, and that after Border's authority ended, no fiduciary duty existed to preclude Border from acquiring leases in the "review" area without first submitting them to Irish Oil. The court essentially found that the agency and subagency obligations with regard to purchasing leases and submitting leases for review ended on March 24, 2011, particularly in light of the anticipated closing date of April 15, 2011. Although evidence establishes "due diligence" continued under the contract until late April 2011, the court did not find this fact imposed a continuing fiduciary duty on Border.

[¶ 28] While the district court may have failed to acknowledge that Border may also have owed a fiduciary duty, albeit more limited in scope, based on Border's remaining obligation to perform due diligence and title curative work for Irish Oil, the parties' contract on this point was silent. The result in this case may well have been different if the parties' contract had specifically delineated the parties' mutual intentions regarding the fiduciary duty or if Border had used confidential information from Irish Oil in learning of the Wolski acreage's availability. Nonetheless, under these facts and circumstances, we conclude the court did not err in holding that no fiduciary duty precluded Border from acquiring the Wolski leases after Border's authority to acquire leases had been terminated.

[¶ 29] Irish Oil also contends the AAPL ethical standards and standards of conduct governed the conduct of Border and its landmen while performing under the contract and impose a fiduciary duty on Border. We have previously addressed when custom and usage may be used to interpret a contract:

[C]ustom and usage may be given effect as part of a written contract where the agreement is silent or ambiguous on a point, and where there is a well-established custom concerning a subject so that the parties may be presumed to have acted with reference to the custom. The custom or usage must be proved as any other fact. Whether or not a custom or usage exists is a question of fact. *VND*, 2003 ND 198, ¶ 42, 672 N.W.2d 445 (quoting *Hager v. Devils Lake Pub. Sch. Dist.*, 301 N.W.2d 630, 634 (N.D.1981)) (citations omitted).

[¶ 30] Here, the district court was not persuaded that the AAPL standards imposed a fiduciary duty on landmen who are under contract to provide due diligence and curative work. Based on the evidence at trial, the court found that AAPL membership was optional and therefore could not establish an industry-wide standard of care and that a violation of the AAPL's code of ethics, bylaws, or standards of practice could not establish a basis of civil liability. We also interpret the court's findings to implicitly reject using the AAPL's standards to expand the scope of Border's fiduciary duty to Irish Oil under their contract when the parties' intentions are unclear.

[¶ 31] Based on our review, we cannot say that the district court's findings were induced by an erroneous view of the law, that no evidence exists to support its findings, or that we are left with a definite and firm conviction a mistake has been made. We therefore conclude the court's finding that Border did not breach a fiduciary duty in acquiring the Wolski leases was not clearly erroneous.

IV

[¶ 32] Irish Oil argues the district court erred in concluding the leases Border acquired for Irish Oil were sold for $1,100 per net mineral acre. Irish Oil argues the district court incorrectly relied

on a "blended" sale price stated in a contract between Irish Oil and Chesapeake, and Border is entitled only to 25 percent of the profit from the sale of the IRS–TP leases. Irish Oil argues the ELCA leases, which were included in Irish Oil's agreement with Chesapeake, constituted a separate transaction in which Border had no interest or participation and, therefore, Border cannot benefit from Irish Oil's additional effort and investment in the ELCA leases. In determining profit, or the difference between how much the IRS–TP leases sold for and how much they cost, the district court found they sold for $1,100 per net mineral acre. Irish Oil contends this is an incorrect interpretation of the contract between Irish Oil and Chesapeake because that contract used a "blended" sales price, including not only the IRS–TP leases but also additional leases. Irish Oil argues the district court ignored undisputed evidence that Irish Oil and Chesapeake did not intend to set a separate purchase price for the IRS–TP leases. Further, Irish Oil asserts that $825 per net mineral acre is a fair allocation of the price to the IRS–TP leases.

[¶ 33] Border responds that Irish Oil's agreement with Chesapeake specifically provided the purchase price for the leases Chesapeake purchased was $1,100 per net mineral acre without any qualification. Border asserts this agreement does not indicate any differentiation in the selling price between the IRS–TP and ELCA leases. Border also argues that Border and Irish Oil's agreement does not make Border's compensation dependent on the value of the leases acquired. Under their agreement, Border was entitled to 25 percent of the profit of the sale of the IRS–TP leases by Irish Oil. Since Irish Oil's agreement with Chesapeake established a uniform sale price of $1,100 per net mineral acre for all leases, Border asserts that

value must be used to calculate Irish Oil's profit.

[¶ 34] In finding Irish Oil sold the IRS–TP leases for $1,100 per net mineral acres, the district court explained:

[T]he only evidence provided to the Court of what was the amount for which the leases acquired by Border for Irish were actually sold is the $1,100 per each net mineral acre referenced in the Irish/Chesapeake Purchase and Sale Agreement. The Court finds that $1,100 per each net mineral acre was the clearly stated sale price in the Irish/Chesapeake Purchase and Sale Agreement. The Court further finds that Irish has not presented any evidence that the clearly stated sales price for the leases acquired by Border for Irish sold to Chesapeake was any other specifically stated sum.

The Court further finds that the testimony of Jeff Brooks, the Chesapeake representative who negotiated and executed the Irish/Chesapeake Purchase and Sale Agreement, does not indicate that any other price for the leases acquired by Border for Irish was either understood or agreed between Irish and Chesapeake. In fact, Brooks testified that the price paid for the lease[s] which were the subject of the Irish/Chesapeake Purchase and Sale Agreement was $1,100 per net mineral acre; and he couldn't recall how that price was arrived upon except that such was the price paid to Irish on a previous deal. It is also noteworthy to the Court that Furlong testified that Brooks told Furlong he did not have authority to purchase at the $1,350 per net mineral acre, which Furlong claims the ELCA leases were worth.

Nevertheless, Irish argues that "the only question is how the blended price should be allocated between the two

lease packages for the purpose of determining how much profit was made on the IRS–TP leases ...” While Irish might view such as an overly simplistic perspective, the Court views the gist of Irish's argument to be that “it's just not fair” that Border should benefit from that blended sale price. Irish says as much in several places in its post trial brief.

. . . .

Based upon the clear terms of the parties' contract and the evidence of the stated sales price in the Irish/Chesapeake Purchase and Sale Agreement, undifferentiated from the ELCA leases as to sales price, the Court finds that the sale price of the leases acquired by Border for Irish was $1,100 per net mineral acre.

[¶ 35] Based on our review of the record, we conclude that the district court's finding of fact that Irish Oil sold the IRS–TP leases Border had acquired for Irish Oil to Chesapeake for $1,100 per net mineral acre is not clearly erroneous.

V

[¶ 36] Irish Oil argues the district court erred in refusing to allow it to amend the counterclaim for breach of fiduciary duty to add Border's individual landmen as counterclaim defendants.

Under N.D.R.Civ.P. 15(a), once a responsive pleading has been served, a complaint may only be amended by leave of court or by written consent of the opposing party. A district court has wide discretion in deciding whether to permit amended pleadings after the time for an amendment has passed. *Darby v. Swenson Inc.*, 2009 ND 103, ¶ 11, 767 N.W.2d 147. We will not reverse the district court's decision whether to grant a party's motion to amend unless there is an abuse of discretion. *Id.* A district court abuses its discretion when it acts arbitrarily, unconscionably, or unreasonably, or when its decision is not the product of a rational mental process leading to a reasoned determination. *Farmers Alliance Mut. Ins. Co. v. Hulstrand Const., Inc.*, 2001 ND 145, ¶ 10, 632 N.W.2d 473. When a proposed amendment would be futile, the district court does not abuse its discretion in denying a motion to amend the complaint. *Darby*, at ¶ 12.

*Johnson v. Hovland*, 2011 ND 64, ¶ 8, 795 N.W.2d 294. This Court has described the various standards applied depending on when a party moves to amend its complaint:

If leave to amend is sought before discovery is complete and neither party has moved for summary judgment, the accuracy of the “futility” label is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6). In this situation, amendment is not deemed futile as long as the proposed amended complaint sets forth a general scenario which, if proven, would entitle the plaintiff to relief against the defendant on some cognizable theory. If, however, leave to amend is not sought until after discovery has closed and a summary judgment motion has been docketed, the proposed amendment must be not only theoretically viable but also solidly grounded in the record. In that type of situation, an amendment is properly classified as futile unless the allegations of the proposed amended complaint are supported by substantial evidence.

*Id.* at ¶ 9. “Other courts have explained that an amendment is futile for purposes of determining whether leave to amend should be granted, if the added claim would not survive a motion for summary judgment.” *Id.* (quoting *Darby*, at ¶ 13).

[¶ 37] Here, the district court entered a scheduling order on February 5, 2013, specifically requiring that all fact discovery be completed by April 5, 2013, that discovery on expert witnesses be completed by May 7, 2013, and that all non-dispositive and dispositive motions be filed by April 12, 2013. On April 26, 2013, Irish Oil moved the court under N.D.R.Civ.P. 15(a) and 20 to amend its answer and counterclaim to add Kenjalo, Skaare, and Zastoupil, who Border had contracted with to provide the services, as counterclaim defendants to the existing counterclaim against Border. The court subsequently denied the motion, concluding the amendment was futile because Irish Oil made conclusory assertions the individuals were subagents and owed a fiduciary duty to Irish Oil by virtue of their relationship with Border and because the individuals would not owe a fiduciary duty to Irish Oil absent a separate principal-agent relationship.

[¶ 38] Irish Oil argues the district court abused its discretion in refusing to allow the amendment to add the specific landmen in their individual capacities as counterclaim defendants. Irish Oil asserts it moved "months before trial" to amend the counterclaim to include a claim against the landmen alleging they breached their fiduciary duty while acting as either Irish Oil's agents or subagents. Irish Oil contends the court erred because it provided sufficient facts to establish direct claims against the three landmen, and testimony and discovery responses established a direct duty owed to Irish Oil, which was breached, and a subagency relationship under N.D.C.C. §§ 3–02–13, 3–02–14. Irish Oil asserts it also showed the individuals profited from the sale of the Wolski leases. Irish Oil therefore contends the amendment to the counterclaim was not futile, and the court should have granted their motion.

[¶ 39] Border responds that the motion was beyond the district court's deadline for amending pleadings and the proposed amendments were futile. Border contends that, as a limited liability company, its agents are not personally liable for the acts or obligations of the company just by being the company's agents under N.D.C.C. § 10–32–29(1). Border also argues that its landmen were not Irish Oil's agents, absent a separate agreement. See N.D.C.C. § 3–02–15; Commercial Bank v. Red River Valley Nat'l Bank of Fargo, 8 N.D. 382, 387, 79 N.W. 859, 861 (1899) ("A mere agent of an agent is not responsible as such to the principal of the latter."). Border therefore asserts the court did not abuse its discretion in denying Irish Oil's motion.

[¶ 40] A district court has "wide discretion" in deciding whether to permit amended pleadings after the time for amendment has passed. See Darby, 2009 ND 103, ¶ 11, 767 N.W.2d 147; see also Ward Farms v. Enerbase Coop. Res., 2015 ND 136, ¶ 27, 863 N.W.2d 868; Thimjon Farms P'ship v. First Int'l Bank & Trust, 2013 ND 160, ¶ 28, 837 N.W.2d 327. In denying Irish Oil's motion to amend, the district court noted Border's argument regarding untimeliness and decided Irish Oil had not established a relationship between Irish Oil and the landmen to impose a fiduciary duty. Moreover, in this case, the district court made specific findings of fact after trial that are dispositive and that we are affirming on appeal. See, e.g., Brandt v. Somerville, 2005 ND 35, ¶ 27, 692 N.W.2d 144.

[¶ 41] Here, the district court specifically found that Border carried out the work required by the contract through its employees and its contract landmen; that Irish Oil had no contracts or agency relationships with Border's employees or con-

tract landmen, including but not limited to Skaare, Kenjalo and Zastoupil; that Border did not breach any fiduciary duty to Irish Oil; and that Border did not breach any contract or other obligation owed to Irish Oil. Therefore, even if the district court erred in deciding Irish Oil's proposed amendment to its counterclaim to add parties was futile, we conclude the court did not abuse its discretion in denying the motion.

## VI

[¶ 42] We have considered the remaining arguments raised by Irish Oil and deem them to be either unnecessary to our decision or without merit. The district court judgment is affirmed.

[¶ 43] GERALD W. VANDE WALLE, C.J., DAVID E. REICH, D.J., DANIEL J. CROTHERS and DALE V. SANDSTROM, JJ., concur.

[¶ 44] The Honorable DAVID E. REICH, D.J., sitting in place of KAPSNER, J., disqualified.

CROTHERS, Justice, specially concurring.

[¶ 45] I write separately out of concern about the lack of consideration of the economic loss rule in this and other disputes where breaches of contract are being litigated as tort claims. However, due to the law of the case, I agree with the Court's disposition of this matter. *See Bakke v. D & A Landscaping Company, LLC,* 2012 ND 170, ¶ 17, 820 N.W.2d 357 (unobjected to legal irregularities become law of the case).

[¶ 46] A recent legal commentator noted:

"Most litigants, if given the chance, prefer to assert tort theories to recover their economic losses, rather than rely on the remedies provided under contract law. This is primarily because plaintiffs have the potential to recover more damages under tort law than contract law. However, most courts have adopted a doctrine known as the economic loss rule to bar plaintiffs from asserting certain tort theories to recover for their economic loss. Although the economic loss rule may seem like an easy way to maintain the boundary between tort law and contract law, confusion abounds when courts attempt to determine the proper contexts in which to apply the doctrine."

Note, *Not Just for Products Liability: Applying the Economic Loss Rule Beyond its Origins,* 83 Fordham L. Rev. 1073 (November, 2014).

[¶ 47] This Court reviewed the underpinnings of the economic loss rule in *Clarys v. Ford Motor Company,* 1999 ND 72, 592 N.W.2d 573. The rule (sometimes referred to as the economic loss doctrine) again was reviewed in *Leno v. K & L Homes, Inc.,* 2011 ND 171, ¶ 17, 803 N.W.2d 543. There, we held that, "under the economic loss doctrine in North Dakota, 'economic loss resulting from damage to a defective product, as distinguished from damage to other property or persons, may be recovered in a cause of action for breach of warranty or contract, but not in a tort action.'" (citations omitted).

[¶ 48] A concept closely related to, if not a part of, the economic loss rule discussion is that contract claims ordinarily cannot be asserted as negligence actions. This Court has held:

"In *Dakota Grain Co. v. Ehrmantrout,* 502 N.W.2d 234, 236–37 (N.D.1993), we explained the difference between a breach of warranty action arising under a sales contract and a negligence action. The seller's negligence, or lack of negligence, is not relevant to the question of whether the seller breached his or her

express warranty to deliver conforming goods. *Id.* at 236. A mere breach of contract does not, by itself, furnish a basis for tort liability grounded in negligence. *Id.* Conduct which constitutes a breach of contract does not subject the actor to an action for negligence, unless the conduct also constitutes a breach of an independent duty that did not arise from the contract. *Id.* at 236–37; *see also Olander Contracting Co. v. Gail Wachter Investments,* 2002 ND 65, ¶ 26, 643 N.W.2d 29."

*Superior, Inc. v. Behlen Mfg. Co.,* 2007 ND 141, ¶ 30, 738 N.W.2d 19.

[¶ 49] Here, most if not all duties alleged by Irish Oil to have been breached by Border arose out of their contract. Legitimate questions may have existed whether those claimed breaches of fiduciary duty satisfied the "independent duty" requirement spoken of in the *Superior* and *Dakota Grain* cases. But that was not decided in the district court and it would be inappropriate for us to sua sponte make that inquiry on appeal. I therefore write separately to note that unexplored legal issues remain under the economic loss doctrine, and my signing of the majority opinion should not suggest I agree otherwise.

[¶ 50] DANIEL J. CROTHERS